NED and TAYLOR (slaves) *v*. THE STATE OF MISSISSIPPI.

1. EVIDENCE: PRACTICE IN RELATION TO OBJECTIONS TO WITNESSES.—If no objection be made in the court below, to the examination of a witness, and if no motion be made to exclude his testimony from the jury, it will be too late to object to his competency in this court, for the first time.

2. SAME: CREDIBILITY OF WITNESS.—The principal witness against the accused,

and whose testimony was necessary to their conviction, was a slave. The accused were also slaves, and were charged with the murder of another slave; all belonging to the same master. The witness, on the second day after the killing, was charged by his master with a knowledge of it; which he denied. He was afterwards tied, and stricken one blow by his master; and he, and the other slaves, were at the same time informed, by the master, that he intended to ascertain who did the killing, and that whoever was guilty should be hung. The witness thereupon stated that he was an eye-witness to the killing, and that the accused committed the deed, and that they had threatened to kill him, if he ever divulged it; and he also, at the same time, gave a minute account of the transaction. Four months thereafter, he was examined on the trial, making in substance the same statement. He was corroborated, in some respects, by other witnesses; and he differed from some others, as to the time of the day at which certain facts, having a material connection with the question of the guilt or innocence of the accused, transpired. Held, that he was a competent witness, and that his credibility, was a matter peculiarly in the province of the jury, and that their verdict convicting the accused of the homicide, was well warranted by his testimony.

3. NEW TRIAL: MISCONDUCT OF THE JURY.—If the verdict be rendered under such circumstances, that its purity might have been affected, it will be set aside. But if it could not have been affected, it will be sustained. Where, therefore, one of the jury pending the trial, being at the window of the court-room, called to a person in the street, and asked him to request his (the juror's) wife to send him his supper, to which the person thus addressed replied that "he would;" and the supper was sent, as requested, and the persons who brought it, came into the room where the jury were confined, but were not permitted to deliver it to the juror, the officer in charge of the jury receiving it from their hands, and delivering it to the jury. The officer also kept the persons who brought the supper, on the opposite side of the room, sixty feet from the jury, whilst the supper was being eaten. The officer also testified that nothing passed, between the juror and the person addressed by him in the street, except what is above stated; and that, to his knowledge, the jury conversed with no one. It was held, that there was no improper tampering with, or sinister influence brought to bear on, the jury, and no cause for setting aside the verdict.

4. CRIMINAL LAW: WITNESS: PRACTICE.—The State may, in a criminal case, examine a witness whose name is not marked on the indictment, and who has never been summoned to testify.

IN error from the Circuit Court of Yazoo county. Hon. E. G. Henry, judge.

The plaintiffs in error were indicted in the court below for the murder of Ely, a slave. Upon the trial, W. M. Pickett, for the

State, testified that he was the owner of the defendants, Ned and Taylor, and also of Ely, the deceased.   That on Sunday night, ——— July, 1856, being informed that Ely, who was his driver, was missing, and suspecting that some casualty had befallen him, he caused a lake to be dragged, which was distant about one and a half miles from his negro quarter ; that Ely had a fish-trap in this lake, and was in the habit of visiting it on Sundays.   That this search was fruitless, and on Tuesday following he rode down to the lake, and discovered Ely's body floating on the water.   After the body was removed, he noticed that the skull was fractured.   Witness then made a search, for the purpose of ascertaining who had committed the murder.   He found a pair of pantaloons, in one of the negro cabins, which Ned, one of the accused, acknowledged were his ; on them, were spots of blood.

A. F. Carson, for the State, testified that Ely was on the plantation on the Sunday before referred to ; was in good health, but was missing on Sunday night.   He examined Ely's body after it was found.   His head was fractured and broken, as if struck by an axe ; the mouth was mutilated, as if it had been bitten by fish. Witness thought the wounds might have been made by a hatchet, but not by a snag.

Sam, a slave, a boy about fifteen years old, and belonging to Wm. M. Pickett, testified for the State, that on the Sunday before referred to, he (witness), Ely, and another negro man, named Charles, started about one hour by sun, to the lake.   After going some distance Charles left them, saying he was going home.   Witness and Ely went to the lake together, and remained there about half an hour, fixing the fish-trap.   They then started home, and about one quarter of a mile from the lake, just as they passed by a large tree, he heard the report of a pistol.   Witness and Ely both looked back, and saw Taylor (one of the accused) coming from behind the tree, with a blue-colored double-barrelled pistol.   Taylor laughed and said he had scared Ely ; to which Ely replied, "No, he hadn't." Taylor then bantered Ely to wrestle with him ; Ely declined, when Taylor gathered him around the body and threw him down.   After wrestling some time, Ely called to witness to get some switches and whip Taylor, which witness did not do ; but at the request of Ely, he caught hold of Taylor's legs to pull him off, when Taylor cursed

Ned and Taylor *v*. The State.

him and kicked him in the stomach. Ely then caught hold of a bush and pulled himself up. The parties continued wrestling until they got some distance down the hill, near a tree, when Taylor threw Ely on his face and cried out, " Come on, boys, I've got him." Ned then run up with an axe in his hands, but before reaching the place where they were, Ely cried to Ned not to kill him with that axe. Ned made no reply, but struck Ely with the sharp edge of the axe across the upper lip, holding the axe in both his hands, and striking seemingly with great force. The axe penetrated to the teeth, severing but not cutting the lip entirely off. Witness did not think any teeth were knocked out. After striking the first blow, Ned reversed the axe, and struck him on the back part of the head, with the eye of the axe, which broke his skull. The deceased bled profusely, and the accused covered up the blood with leaves. The fight occupied about fifteen minutes. The accused then consulted for some time as to what they should do with the body, and concluded to throw it in the lake. Ned took the head and shoulders of the deceased, and Taylor the feet. Blood was still dripping from the head of deceased, which hung rather over the shoulders, and on the breast of Ned. In that position they carried the deceased to the lake, when they laid the dead body on a log, after stripping off all the clothes except a shirt. They went down the lake after a canoe, and after placing the deceased in it, rowed down the lake some distance, then cast the body out in the water, after which they washed the blood from the canoe and log. The accused said they would bury the clothes, to prevent detection, and told witness that if he ever looked as if he knew anything about it they would kill him. They then went back to the place where Ely was killed, and covered up the blood with leaves. Witness did not inform on the accused until the following Tuesday. His master told him he knew about this matter, and struck him one "lick" to compel him to divulge it; but he denied all knowledge on the subject; but afterwards his master tied him, and he confessed all. Witness was sure that the sun was not more than one hour high when he and Ely left the negro quarter. Ely had at that time a hatchet in his hand.

Bob, a slave, for the State, testified, that he was at Pickett's on the Sunday alluded to ; that he saw Ned, one of the accused, leave

the quarter with Ely, about two or three hours by sun; that he remained there until the sun was about an hour high, and saw nothing more of Ned or Ely.

The State here closed.

Mary, a slave, for the defence, testified, that on the Sunday that Ely was killed, Ned came to her cabin and borrowed a coat; this was just before sundown.

Washington, a slave, for the defence, testified, that he saw Ned about an hour before sundown, on the Sunday Ely was killed; he was at the well at Pickett's quarter; had on a coat; his appearance was natural; and witness saw no unusual excitement about him.

Annie, a slave, for the defence, testified, that she is a sister of Taylor; that her cabin is near the house of the overseer of Pickett; that on the Sunday Ely was killed she observed Taylor, one and a half or two hours by sun, scraping an axe-handle; he was so engaged until about an hour by sun, when the horn blew for the ploughmen to go to the lot, and feed their horses; that Taylor went to the lot, and after feeding, returned to her cabin, and remained there, until called up late at night to search for Ely. She knew that Taylor went to the lot to feed, for if he had not gone he would have been whipped, and he had not been whipped. Witness's cabin is about one hundred and fifty yards from the lot.

Jordan and Tom, slaves, stated, they saw Ned on the Sunday above referred to, just before sundown; and Suky, a slave, saw him about two hours by sun.

William M. Pickett, for the defence, testified, that he had never whipped the witness, Sam, that he remembered of, but may have struck him one "lick;" that he told his negroes that some of them had killed Ely; and that he (witness) would find out who did it; and whoever did it should be hung. Having heard that Sam was last seen with Ely, he took him up, and told him he knew who killed Ely, and that he must tell. Sam at first denied it; but witness afterwards tied him, and told him to say who killed Ely. Sam never varied materially in the statements he made concerning the matter; they were the same in substance as he had related from the witness-stand. Witness and Mr. Herrett were carried by Sam to the spot

Ned and Taylor *v.* The State.

where he said Ely was killed, and after removing some leaves or brush, they found something which looked like blood.

Perry C. Dixon, for the defence, testified, that several years ago he had overseen a plantation, on which the accused were, and that they were both well-behaved, obedient, and humane negroes.

The State, in rebuttal, introduced A. F. Cason, who stated, that he was overseer for Pickett, and that the regular feeding-time on Sunday evening was about sundown ; that he never whipped Sam about the killing of Ely, nor did he know that his master had.

Dick, a slave, for the State, testified, that he saw Ned on the Sunday evening of the killing, about sundown ; that he had an axe on his shoulder ; his pantaloons were wet, but witness saw no signs of blood on them.

The State also made formal proof of the venue. At the time Cason was offered as a witness for the State, the prisoner objected to his being sworn, because his name did not appear to be marked on the indictment as a witness, nor had he been summoned to testify in the cause. This objection was overruled, and the witness was sworn and permitted to testify as above stated.

The jury convicted the prisoners of murder. They made a motion for a new trial, for the reasons stated in the opinion of the court. On the trial of this motion certain witnesses were introduced, and testified as set out in the opinion of the court. The motion being overruled, and sentence of death pronounced on the prisoners, they sued out this writ of error.

*R. Bowman,* for plaintiff in error,

Filed an elaborate brief, reviewing the evidence, and insisting that it was insufficient to sustain the verdict of conviction. On the point that a new trial should be granted, on account of the conduct of the juror Holmes, he cited, *Boles* v. *The State,* 13 S. & M. 400 ; *Hare* v. *The State,* 4 How. Miss. 187 ; *McCann* v. *The State,* 9 S. & M. 466.

*T. J. Wharton,* for the State.

On the point made, that the conduct of the juror Holmes was irregular and vitiated the verdict, cited *Boles* v. *The State,* 13 S. & M. 400 ; Nelson's case, Ib. 500 ; 5 Miss. R. 25 ; 11 Leigh's R. 633,

714; 10 Yerg. R. 529; 4 Humph. 27; 5 Ire. 58; 12 Pick. 496; 3 Bibb, 8.

*Q. D. Gibbs* and *George B. Wilkinson*, on same side, filed an elaborate brief.

SMITH, C. J., delivered the opinion of the court.

This writ of error is prosecuted to reverse a judgment of the Circuit Court of Yazoo county, in which the plaintiffs in error were convicted and sentenced for the murder of Ely, a slave. A motion was made for a new trial on the following grounds, to wit: 1. Because the verdict was contrary to law and evidence. 2. Because witnesses who should have been excluded were allowed to testify at the trial. 3. Because the court erred in charging the jury. And, 4. On the ground of improper conduct of one of the jurors.

The second and third grounds assigned in support of the motion seem to have been abandoned, as they have not been pressed upon our attention in the argument of the counsel for the prisoners. We have however examined them; and pass them with the single observation, that in our opinion they are clearly untenable.

The prisoners were slaves, the property of William M. Pickett; and Sam, another slave of the same master, was the principal witness examined for the prosecution. In fact, he was the only witness who was present at the commission of the alleged homicide. He was examined without objection; and, if credible, there is not the slightest pretence for saying, that the finding of the jury was against the preponderance of the evidence. The effort is to discredit him; and it is conceded, that excluding his testimony, the verdict was unwarranted.

This witness (Sam), after having given a very clear and minute account of the killing, testified, that the "accused threatened him that, if he ever looked as if he knew anything about the matter, they would kill him; that he did not inform on the accused until the following Tuesday. His master told him he knew about the matter, and had struck him one lick to compel him to divulge it; but he denied all knowledge. But afterwards his master tied him, and he confessed all." William M. Pickett, the master, in his testi-

mony, gave, substantially, the same version of this part of the transaction. He stated that "he had never whipped Sam that he remembered; may have struck him with a whip, one lick; but that he had told the negroes that some of them had killed Ely, and that he would find out who did it; and that whoever did it should be hung. Having heard that Sam (the witness) was last seen with Ely, he took him up, and told him he knew who killed Ely. Sam, at first, denied it; but he afterwards tied him, and told him to say who killed Ely. Sam never varied materially in the statements which he made in reference to the murder. They were the same as related from the witness-stand." The statements of the witness, on this occasion, were made in July, and the trial was had in the November following. And it does not appear that any menace or other means was subsequently used to induce the witness to persevere in his account of the transaction. From aught that appears from the record, his testimony at the trial, was fairly given, and without the slightest appearance of constraint arising from any cause whatever. This conclusion is unavoidable; for otherwise the prisoner's counsel would, doubtless, have objected to the examination of the witness, or have moved to rule out his testimony, upon the ground of incompetency, or the court, at their instance, would have given to the jury proper instructions on the subject.

In the state of the case presented by the record, the exception applies exclusively to the credibility of the witness. His competency was conceded by the prisoners' omission to object to the introduction of his testimony. And whether the witness was credible or not, was a question which lay within the peculiar province of the jury.

The testimony of this witness bears upon its face very strong evidence of its truthfulness. It vindicates itself; and leaves no ground to doubt that he was an eye-witness of the transaction which he described. There is, however, a conflict between Sam and some of the other witnesses, arising from his statement of the time of day, when he and the deceased left the plantation on their way to the lake, and their statements as to the time when the accused were seen at the quarter. But these were facts in regard to which the witnesses might have been most easily mistaken, and hence the greater probability that their statements would not agree. But

Sam's testimony, in several important particulars, is corroborated by facts deposed to by other witnesses. Upon the whole, we cannot doubt that the jury were fully justified in giving full credit to his testimony.

The remaining ground, claimed as a cause of reversal, refers to the conduct of Holmes, one of the jury who returned the verdict.

The facts relied on, as demonstrating the illegal conduct of Holmes, while acting as a juror in the case, are stated in the testimony of the witnesses, who were examined on the trial of the motion.

The testimony of these witnesses is substantially as follows, to wit:

F. W. Battaile testified, that he was walking on the pavement, and opposite the court-room, about the time the cause was on trial; said Holmes, one of the jury, put his head out of the window, called to him, and asked witness to tell his (Holmes's) wife to send him his supper. To which he replied, "Well," and afterwards delivered the message to Mrs. Holmes. The jury-room, where Holmes was, might have been sixty feet from the pavement, where witness was when called to by Holmes, and twenty feet from the ground.

Dr. Wilson testified to the same in substance, and, in addition, stated that Holmes's request and Battaile's reply was all that passed between them.

W. H. Mangum, an officer in attendance upon the jury, stated that, to his knowledge, the jurors conversed with no one. That Holmes's son brought a note to Holmes, which the witness would not allow to be delivered, but took it from the bearer, and told Holmes that he could receive no messages from his wife.

And George W. Jones, special bailiff in charge of the jury, testified, in addition to facts sworn to by the other witnesses, that the little son of Holmes, and a little negro boy, brought up Holmes's supper; they both came into the room where the jury were, with the supper; but witness received the supper from their hands, and sent them to the opposite side of the room from the jury, at a distance of about sixty feet.

The general rule recognized by this court, and applied to questions similar to that which is before us, is, that if the verdict was rendered under circumstances in which its purity might have been

affected, it must be set aside; if it could not have been affected, it will be sustained. *Hall* v. *The State,* 4 How. Miss. Rep. 194.

Applying this rule to the case under examination, it is very clear that the evidence shows that there was no improper tampering with, or sinister influence brought to bear, upon the jury. It goes further, and renders it certain that there could have been none.

The judgment will therefore be affirmed.