## CATES *v.* STATE.

(In Banc.   Oct. 22, 1934.)

[157 So. 95.   No. 30982.]

Richardson & Sandford and Dees Stribling, all of Philadelphia, and M. V. B. Miller, of Meridian, for appellant.

**J. B. Hillman,** of Philadelphia, and **Howie & Howie,** of Jackson, for appellee.

W. D. Conn, Jr., Assistant Attorney General, for the state.

110

Argued orally by **M. V. B. Miller**, for appellant, and by **J. H. Howie** and **W. D. Conn, Jr.**, for the state.

**Ethridge, J.**, delivered the opinion of the court.

Prince Cates was indicted, tried, and convicted of the murder of Bob Cooper in the circuit court of Neshoba county, Mississippi, and sentenced to death.

The immediate circumstances connected with the killing and leading thereto were that on the day before the killing, Sunday, Mr. Cooper took his gun and shot several times at cows which were trying to break into his cornfield, and some of the shots reached the house of the appellant and struck appellant's little child, inflicting burns or marks, but without penetrating the flesh. Mrs. Cates testified that she asked Mr. Cooper about the mat-

ter, and that he replied that he did not give a damn, or words to that effect, and that the child ought to have been in the house. At the time of this shooting, Prince Cates was away from home, either fishing or hunting, and, on returning that afternoon, the little child told him about her being shot, as she expressed it. Cates then asked his wife, the child's mother, if the child was correct about it, and she told him about the whole incident, which disturbed him very greatly, and she said he wept and prayed during the night as to what he should do to protect his family, and it appears that he also talked with a neighbor, telling him the circumstances and asking him how he would like for his child to be shot.

On the following morning, just prior to the killing, a young lady passed and spoke to Cates, and she testified that he was sitting on his porch cleaning his gun. A few minutes after this young lady passed, Cates saw the deceased, Cooper, feeding his hogs near by, and walked down there, taking his gun. The deceased, Cooper, was in a conversation with Mr. Burnside, and Cates stated to Cooper, the deceased, that he had shot his little child; Cooper asked him, in effect, where the child was and how about it, whereupon Cates stated, "I will show you," raised his gun and fired, the shot taking effect in Cooper's abdomen, resulting in his death. Cates then walked away and met another party, asking him to "go call the law," that he had killed Cooper. This party telephoned the sheriff, who came forthwith to the scene of the killing. When he arrived, Cates walked up and stated that he guessed he was the party the sheriff was looking for, and surrendered to the sheriff. Cates was placed in the car, and the sheriff started up to where the deceased lay, and Cates asked him not to drive him up there, as he did not want to go, whereupon he was placed in a car with the deputy sheriff and taken to Philadelphia and placed in jail. When they reached Philadelphia, they met the

county attorney, or he was seen. It is not clear whether he was in the party who went to the scene of the killing or not, but Cates had a talk with the county attorney, and made a statement to the deputy sheriff and the county attorney, saying that, when he was told of the child being shot, it made him mad, and the more he thought about it the madder he got, and that he went down to where the killing occurred, and stated to Cooper that he had shot his (Cates') child, and that Cooper started toward him, and he shot because of the injury to his child and because he was afraid of Cooper. Burnside, a witness to the shooting, and other witnesses, testified to substantially the facts above stated, except as to the conversation in jail. The sole defense offered was insanity.

A number of witnesses testified that Cates was all right up to the time he went into the World War; that he had been shell-shocked and was drawing disability compensation, and that his mind was not right, and that he was regarded as being of an unsound mind; and many witnesses testified that, at times, in their opinion, he did not know right from wrong.

A sister of Cates testified that two of her brothers and one of her sisters died insane, and that one of her children, a boy of fourteen, was then insane and was confined in the state hospital for the insane. She also testified to a number of occasions when Cates was really disturbed and excited, and would talk to the Lord and claim the Lord talked to him, and that on one occasion he kept them up all night looking for the Lord to come, and stated that he wanted to be the first to hug His neck when He came. One of these visits was on June prior to the killing in August, and both the sister and her husband testified that on this occasion Cates came to their home to borrow a gun to kill his wife and child, and that they kept him during the night, and that he was greatly disturbed, that he was, doubtless, insane, and that he did not know right from wrong.

Two local physicians living at Noxapater testified as to Cates being insane, stating that, at times he did not know the difference between right and wrong.

After Cates was placed in jail, another physician was called to attend him, observed him, and stated that he was highly nervous and was of unsound mind, that some little time before the killing he was called, as a physician, to attend appellant's wife in childbirth, and that appellant's conduct, at that time, convinced this physician that the appellant was insane.

Dr. O. A. Schmid, a physician of many years' experience, holding a position in the East Mississippi Hospital for the Insane, and having held various positions in various states covering many years' dealing with insane persons, stated that he was requested to go to Philadelphia and determine whether the appellant was sane or insane; that he did so, and examined the appellant several times, sometimes in the morning, and then in the afternoon, and held conversations with him, and that he had reached the conclusion that Cates was afflicted with dementia præcox, and was insane, but that, not wishing to base his opinion on observation alone, he came to Jackson, Mississippi, and made a study of the records in the office of the Disabled Veterans' Bureau and obtained the history of the case as made from records and other sources, and that it appeared that the appellant was injured in the Sans Area by the explosion of a shell, was knocked unconscious, and was picked up bleeding from the mouth, ears, and nose, and remained unconscious for about three weeks; that he recovered sufficiently to be taken back into the Army, and that he was in the battle of Argonne Forest and other places, and was again sent to the hospital in that area suffering from a loss of memory; that he was discharged, and was sent to nine different government hospitals at different times, one being a hospital for the insane, and suffering from tuber-

culosis, and at most of the hospitals he was declared to be insane, but that some pronounced it hysteria, which the witness said was, under later authorities, recognized as a form of insanity. Dr. Schmid also observed the appellant during his trial, and from this study, as well as his examination of appellant's history, he was clearly of the opinion that Cates was suffering from dementia præcox, and that the effect of this was that at times he did not know the difference between right and wrong.

There were a number of witnesses who testified that the appellant did know right from wrong, and there were some who said he was not insane at all.

The state, in rebuttal, called three physicians who had had experience with insane persons, the first being Dr. J. S. Hickman, who testified that he formerly lived at Philadelphia, but being then on the staff of physicians of the insane hospital at Jackson; that on a former occasion, through a request of a relative of Cates, he took him into his private hospital at Philadelphia, and that he was in a highly nervous condition, but that he was of the opinion that Cates knew right from wrong. He further testified that, in his opinion, there were inferences in favor of insanity shown by the conduct of the appellant during the trial. In answer to a question as to whether or not Cates was insane at the time of the killing, the physician answered:

"Well, I might answer that directly, and I might answer it in two ways. I have known Mr. Cates for a good while, and he has been a man of unstable vitality, physically and probably mentally. I never thought that Mr. Cates was a dangerous man if he was insane. Now then, if you ask me the question the way it looks to me at the time he did the killing, is that the question?

"Q. Yes, I want to find out at that time. A. It looked to me like he knew what he was doing."

The state also introduced Dr. T. G. Cleveland, who had

been connected with the Mississippi Hospital for the Insane at Meridian from 1913 to 1917, and who was in the Army from 1917 to 1919, and he was asked what insanity is, and he answered that was a hard question, but he would try to give a simple answer, and said that: "Insanity is a deviation from the normal way of thinking, acting and speaking." The state then asked this physician a hypothetical question as follows:

"Now, doctor, I want to ask you this; as you have heard from the testimony, this is a murder trial in which the defendant, Prince Cates, is charged with the killing of Bob Cooper. Now directing your particular attention to the insanity or to the sanity which means that a person should know the difference between right and wrong, I want you to keep that in mind, please sir, and listen to this question. If at any time you don't understand my question nor hear it, stop me and we will be understood. If Bob Cooper shot some cows on Sunday and some of the shot fell in Prince Cates' house and struck his little girl and when he came in that evening his wife told him about it and it made him mad and the more he thought about it the madder he got until he didn't sleep any scarcely all night and the next morning he saw Cooper feeding his hogs on an adjoining lot and he got his gun and was sitting on the front gallery of his home and as Miss Hobby passed by he spoke to her and said, 'Good morning, Miss Hobby,' and he saw Cooper and Sim Burnside talking near the scene where the killing occurred and that he went from his house down to where the conversation was occurring between Burnside and Cooper, and that he took his shotgun on his shoulder and that when he got within a few feet of Cooper he said: 'Bob,' and Bob turned around and Cates said, 'you shot my little girl yesterday,' and Cooper said, 'Where was she,' or words to that effect, and Cates said, 'Damn you, I will shoot you,' and he shot him, and that Cooper said 'don't

shoot,' and that Mr. Burnside said, 'Don't shoot the man,' and that Cooper threw up his hands and that after the shot was fired, Cooper said, 'Oh, Lord,' and that Cates looked at Cooper and looked at Burnside, and went on down a trail towards the post office; that he met Mr. A. J. Gordan and said 'Mr. Gordan,' and Gordan said, 'What,' and Cates said, 'I just shot Bob up there, call the sheriff and tell him to come and get me,' that the sheriff came from Philadelphia and saw Cates and another man and just before reaching them the sheriff stopped his car and Cates inquired if that was the sheriff and when he was told that it was, he said, 'Well, I reckon I am the man you are looking for,' and that when he got into the car and the sheriff headed up towards or in the direction of where Cooper was, Cates said he didn't want to go up there where Bob was. Now, I ask you if, assuming that those facts are true, in your opinion, was Cates sane or insane?

"Mr. Richardson: Don't answer that. I object to that question because it assumes a part of the facts and not all of them, and I just call the court's attention—of course it leaves out many material facts and if I understand, a hypothetical question must carry all material facts. It assumes something that is entirely untrue and unproven by the record, that he was angry. There isn't a word in this record, and I challenge it to show that he was angry. On the other hand, the testimony shows, on the contrary, that he was not angry, and that is one of the things that I object to this hypothetical question.

"Mr. Lee: In answer to that the confession and statement made by the defendant, himself, says that when he came in and she told him about it that it made him mad and the more he thought about it the madder he got.

"Mr. Richardson: That is not in this hypothetical question.

"Mr. Lee: Yes it is.

"Mr. Richardson: There are other things not embodied in this hypothetical question. I object to it.

"The Court: Objection overruled.

"A. You have directed me with the difference that sanity, as you call it, is determined by the knowledge of the difference between right and wrong. I will answer that in my opinion the man did know the difference between right and wrong, and therefore at the time the act of the killing was committed he was sane."

The state also asked Dr. H. C. Sheffield a hypothetical question as follows:

"Now with particular reference to the proposition of insanity that we are dealing with here, now I want to make inquiry of you, keeping in mind that all I am interested in is the ability to distinguish between right and wrong. Now, with that idea and if a person is able to distinguish between right and wrong, that he is sane, I want to ask you this question: As you understand this is a case where Mr. Prince Cates, the defendant, is charged with the murder of Bob Cooper on the seventh day of August this year, and the defense is insanity. Now I want to ask you this: If the man, Bob Cooper, shot some cows on Sunday and some of the shot fell in Cates' house and struck his little girl, and when he came in that evening, or that night, his wife told him about it, and it made him mad, and the more he thought about it, the madder he got, until he didn't sleep any scarcely that night, and the next morning he saw Cooper feeding his hogs on an adjoining lot, and got up and got his gun and had it across his lap, and was sitting on the front gallery of his home when Miss Hobby passed along there, and he spoke to her and said, 'Good morning, Miss Hobby,' and he saw Bob Cooper and Sim Burnside standing down there some distance talking near the scene where this killing occurred, and that he went from his

house down to where the conversation was taking place, and took his gun on his shoulder, and that when he got within a few feet of Cooper he said, 'Bob,' and Cooper turned around, and Cates said, 'You shot my little girl yesterday,' and Cooper said, 'Where was she' or words to that effect, and Cates said, 'Damn you, I will shoot you,' and shot him, and that Cooper said, 'Don't shoot,' and Burnside said, 'Don't shoot the man,' and that Cooper threw up his hand at the time he shot, or after he shot, and Cooper said, 'Oh, Lord;' that Cates looked at Cooper and looked at Burnside, and went on down the trail towards the post office, where he met Mr. A. J. Gordan and said, 'Mr. Gordan,' and Gordan said, 'What,' and Cates said, 'I have just shot Bob up there, call the sheriff and tell him to come and get me.' That the sheriff did come from Philadelphia, and as he was driving up he saw Cates and another man, and stopped his car and called him, or Cates inquired if that was the sheriff, and the sheriff told him it was, and he said, 'Well, I reckon I am the man you are looking for,' and got in the sheriff's car, and he drove up towards the place where Cooper was lying dead, and Cates told him that he didn't want to go up there where Bob was. Now, if those facts and circumstances are true, in your opinion, was the man, Cates, sane or insane at the time he killed Bob Cooper?

"Mr. Richardson: I object to that question on the same ground as the other that it doesn't state all the material facts. It assumes things to be true that haven't been proven true. It assumed one material thing I didn't think of before, it assumes that Cates saw Cooper at the hog pen feeding his hogs, and that there is not a word of truth in this record about it and I challenge the record.

"Mr. Lee: All right, in answer to that, I say that the testimony by Mr. Darby, the deputy sheriff, when he made the statement to him in the jail said that he looked over there and saw him while he was feeding the hogs and saw him talking to Burnside."

Objections to these questions were overruled, and the witnesses were permitted to base their opinions as to insanity on these hypothetical questions, and also upon observation of the appellant during the trial. It will be noted that the objections to these questions were based upon the ground that they did not contain all the material facts in the case. In 5 Encyc. of Evidence, p. 626, it is said that: "It is always safer in asking questions of an expert to enunciate all the particulars upon which his opinion is sought, but the hypothetical case stated by the examiner should not include matter altogether unnecessary for the forming of an opinion; and mere fanciful questions which assume facts wholly irrelevant to the matters under investigation, should be excluded. And it has been held that it is not error for the court to refuse to permit all the testimony given in a case to be read as a hypothetical question. The question should not include immaterial circumstances, which will have a tendency to mislead the jury into the belief that such immaterial matters are of some value. Where hypothetical questions are resorted to in the examination of expert witnesses, they must be so framed as to fairly reflect facts either admitted or proved, otherwise the testimony drawn out by them can have no real value, but may do much harm in the decision of the case, it being held that before a witness will be allowed to give his opinion as an expert upon a state of facts, knowledge of which he derives from other witnesses, he must be put in possession of all the facts, as ascertained or supposed, on the question about which the inquiry is made, and that an opinion given upon a partial statement of the facts is inadmissible and of no value."

In People v. Vanderhoof, 71 Mich. 158, 39 N. W. 28, 36, it was said: "It was the duty of the prosecution to lay the whole case of this man's sickness and death, as they had made it, before these experts, or so much of it as had

an important bearing upon his death, instead of picking out detached portions of it to suit their theories of the case. The whole of the undisputed important facts of the last sickness, and developed at the post mortem, should have been embraced or summarized in the hypothetical questions leading to and inquiring as to the cause of death. But this was not done, nor fairly attempted to be done. Important facts were left out, and some things inserted that were not facts, and could not consistently be claimed to be facts within the testimony. It is impossible to particularize all these omissions or the insertions of facts. Nor is it necessary to do so. Nearly all the hypothetical questions propounded by the people to the medical experts confined the symptoms of the deceased to twelve or twenty hours before his death, ignoring his condition and ailments previous thereto; and gave only a partial statement of the results of the post mortem. The difficulty of the heart, with which Vanderhoof thought he suffered so long, was studiously avoided, as was the diseased condition of the heart as shown by the autopsy. I believe that even in a civil case all the undisputed facts of a case must be included in an hypothetical question, both as a matter of sound principle, and of reason and justice. Neither party has a right to discard an important undisputed fact because the insertion of such fact may alter or vary the answer or opinion of the witness, to the prejudice of such party. Expert testimony is only allowed upon the theory that it is necessary in some cases, where the jury cannot be supposed to comprehend the significance of facts shown by other testimony, which needs scientific or peculiar explanation by those who do comprehend it. People v. Millard, 53 Mich. 75, 18 N. W. 562. This explanation cannot well be given so as to be of any worth or usefulness, especially in a diagnosis of disease, without all the facts known to exist are made the basis and

foundation of the opinion. So much may a single fact or symptom present or wanting change or vary such opinion that the court's uniformly hold that, if the jury find one single material supposed fact included in a hypothetical question wanting, they must discard and reject the answer to the question as worthless. It has been said that in civil cases it is not necessary to state all the facts; that the party may assume such facts as he chooses to suit the theory of his case; and that the evil arising or liable to arise from such a practice can be remedied by a presentation of the omitted facts upon cross-examination, and that the jury will determine from the skill of the witnesses, and all other circumstances, the weight to be given to the answers to such questions. But every one who has been engaged in active practice at the bar, or who has presided at trials, or reviewed records in the appellate courts as a judge, for the last ten years in criminal cases, knows full well that, when an expert has once fixed his stakes upon the cause of death in answer to the first hypothetical question propounded to him, no subsequent presentation of other facts, or elimination of some contained in the question, upon cross-examination, can easily move him from his first determination. He is on the alert at once to guard and bolster up his opinion, his professional pride is aroused, he seems to feel that his professional reputation is at stake, and he is sometimes the best attorney the party who employs him has in the trial of the case. This is unfortunate, but it seems to be human nature in most cases. And the professional expert has become to be a recognized factor in criminal trials; and his pay for his services ranks, as it well may if the price of the services are to be measured by their value, with, and ofttimes above, that of the attorneys. This being the fact, which cannot be gainsaid, justice and humanity demand that in a criminal case, where life, liberty, and reputation are at

issue, the prosecuting officer, in examining an expert, should lay before such expert fairly and fully every material fact undisputed that can have a possible bearing upon the opinion of such witness. To permit, as was done in this case, a culling of facts to suit the purposes of conviction, to be propounded in hypothesis to the experts, and then to instruct the jury that the only way to contradict the opinion of the experts is by the opinion of other experts, is to deny a fair trial.''

See, also, Earp v. State, 38 So. 288, where this court, in a very short memorandum opinion, held that it was error to leave out, in a hypothetical question, important facts produced in the evidence.

In Prewitt v. State, 106 Miss. 82, 63 So. 330, 6 A. L. R. 1476, the court also discussed the question, but that case was affirmed on the idea that the conviction was proper, and that the errors committed or complained of were not sufficient to reverse the case. At page 88 of 106 Miss., 63 So. 330, 332, the court said that: ''The usual and proper method of examining an expert where it is sought to obtain his opinion is to propound to him a hypothetical question, i. e., one which assumes the truth of facts which the evidence tends to support, and which are stated in accordance with the theory of the examiner; and . . . where the witness is not testifying to his own knowledge the only proper course is to ask him a hypothetical question, and that it is important that the form of the question should be such as not to require or permit him to draw conclusions of fact from the evidence in the case, and that where the evidence is conflicting, or relates to many details, or where inferences of fact must be drawn from the evidence, in order to be reasonably certain of the grounds on which an opinion is based, it is usually necessary that the facts should be stated hypothetically.'' 5 Enc. of Ev., p. 615, Reed v. State, 62 Miss. 405, and it was said in the argument that this case was authority

for the proposition that the state did not have embraced in its hypothetical question the facts developed by the defendant which correctly stated the theory of the case.

We do not think this decision is susceptible of the construction placed upon it by counsel for the state. Where the facts are conflicting, the party producing the expert may state the facts in accordance with his theory of them, assuming them to be true for the purpose of the argument. He is not authorized to omit material evidence bearing on the issue and calculated to influence the decision of the issue, but he must state these facts, where they are not disputed.

In the case at bar, all the evidence tending to show insanity on the appellant was omitted from the hypothetical questions, and explanations were not given of facts produced in the evidence and undisputed tending to show insanity. In other words, the questions propounded to these physicians, and upon which they were asked to furnish opinions, omitted all evidence tending to establish insanity; and, if these facts stated in the hypothetical questions stood alone, there could be no dispute of the fact that the appellant was sane and that the killing warranted the jury in finding a verdict of murder. The expert may have had a different opinion had they been required to assume facts which were not disputed as being true, and may then have reached a different conclusion. It is entirely a mistake to assume that undisputed testimony, although produced by the defendant in a criminal case, can be ignored in framing hypothetical questions to be propounded to experts. In other words, the opinion of experts, familiar with the characteristics of insane minds, is an aid to the jury in reaching a conclusion upon that issue.

It is true the evidence is before the jury, and the experts do not themselves pass upon the truth or falsity of the facts. Therefore it is important that they have all

the material facts on the issue submitted to them on which, to base their opinion.

The state contends, on appeal, that the objections were insufficient to raise this question; the appellant's evidence not being specifically pointed out in the objections.

In this case, there was no effort to put in the hypothetical questions any of the various facts tending to show insanity. The questions omitted the entire history of the case and the appellant's family history, which certainly had a material and important bearing, and was calculated to influence the jury in favor of the theory of insanity. The objections did point out that the questions did not contain all the material facts in evidence, and the court could readily see that the main facts tending to show insanity were omitted from the hypothetical questions propounded by the state. If there had been a fair and full effort to embrace all the facts, and, through oversight, some of the material facts were omitted, then the objectors should be required to state such omitted facts so that the court might see whether they had any material bearing on the issue being tried. Here, however, the court, which heard all the evidence, knew that the state's questions did not contain the very important facts tending to show insanity. The court was not misled into the belief that the questions contained all the material facts, but the theory presented was that the state was not bound to embrace the facts, disclosed by the evidence tending to show insanity. This was, of course, error on the part of the court below.

We think, in the case before us, that the objection was sufficient to call the attention of the court to the fact that the questions did not contain sufficient facts to comply with the rule.

In the opinion of a majority of this court, the evidence tending to show insanity was sufficient to have influenced the mind of the experts, had it been submitted to them,

and that it was caculated to mislead the jury to request an opinion of experts on evidence embracing only a part of the facts, having omitted substantial and material evidence bearing on the issue.

For the errors indicated, the judgment will be reversed and the cause remanded for a new trial.

Reversed and remanded.

**Griffith, J.,** delivered a dissenting opinion.

Except as those matters which are of such highly scientific or technical character as that knowledge thereof is possessed only by experts, juries are not bound by the testimony or opinons of expert witnesses, although the expert opinion may be unanimous. With the exception mentioned, the jury must apply their own powers of practical reason to the common knowledge and observations of the affairs of life, and shall regard the opinions of experts as of little or no weight, when not in accord with substantial reason and practical observation. The responsibility for the enforcement of the criminal laws of this country rests, fortunately, upon juries and not upon experts, and the duty of a jury is to act upon the proved facts of a case when the jury can see, without the aid or suggestion of experts, what those facts mean. So here the proved facts and factual circumstances of this homicide, as disclosed by this record, are so conclusive, as it seems to me, that the killer comprehended and understood the right and wrong of it, and his consequent responsibility to the law for it, as to render it inescapable that a conviction should follow, experts and any number of them to the contrary notwithstanding. For that reason I think the verdict of the jury should be upheld and the judgment affirmed.

**Chief Justice Smith** authorizes me to say that he joins in this dissent.