I.
This appeal follows the conviction of Mary Ann Gerlach on the charge of murder for which she was sentenced to a term of life imprisonment. On appeal Gerlach assigns that the trial court erred in: (1) allowing a said-to-be-improper hypothetical question posed to the psychiatric expert for the State, (2) failing to declare a mistrial or to discharge juror Carvin because of a mid-trial telephone call she received from an unidentified third party, and (3) refusing to grant a new trial on grounds that the jury *Page 76 
verdict was against the overwhelming weight of the evidence.
 II.
It is undisputed[1] that on January 7, 1981, at approximately 6:00 p.m., Mary Ann Gerlach, Defendant below and Appellant here, shot and killed Lawrence A. Kietzer in the house located at 120 Lorraine Road in Harrison County, Mississippi. Gerlach had divorced Kietzer a few weeks prior but was nonetheless living with him at the time of the shooting. Gerlach apparently still held an insurance policy on Kietzer's life.
After the shooting, Gerlach phoned for the police. By the time the police arrived, Gerlach had gone to a neighbor's house. Gerlach was hysterical, fought with the police and attempted to kill herself. After succumbing to police force but before being taken away to the mental ward, Gerlach arranged with a neighbor to take care of her pets. Subsequent to being placed in the mental ward, Gerlach sent money back to a neighbor to provide for care for her son.
On March 16, 1981, Gerlach was formally charged in an indictment returned by a Harrison County Grand Jury with the murder of Keitzer. In due course thereafter, Gerlach entered a plea of not guilty by reason of insanity.
On January 19, 1982, this case was called for trial. Consistent with Gerlach's plea, the testimony centered around the insanity defense. This issue is encapsuled in the disputed hypothetical question posed by the district attorney to a psychiatrist called by the State.
 Doctor, if you have a forty-four year old white female, who has a history of some 13 marriages, the first one taking place at approximately 15 years of age, having had three children, excuse me, four children, four live births, at least one abortion, who has had numerous hospitalizations in Kesler Air Force Base, Gulf Coast Community Hospital, Gulfport Memorial Hospital, Howard Memorial Hospital, who has had episodes of hysteria, suicidal tendencies, and admitted abuser of drugs and alcohol, who on January 7, 1981, shot and killed, as she fired five shots into her husband's body, excuse me, into the body of a man she was living with, having previously divorced this man, some eight weeks prior, with that hypothetical, do you have an opinion as to the sanity or insanity of that person on that date?
The remainder of the iceberg of Gerlach's psyche includes the fact that she is a "hooker" who owns 14 to 15 wigs. Apparently, Gerlach's wearing of different wigs is symptomatic of distinct personality changes. One of her daughters — who was a potsmoker, hooker and had been institutionalized for mental problems — had committed suicide.
Gerlach's matrimonal sequence at times was a bit bizarre:
 Q. Now, when you married — after you were married to Jerry Teeple, you were married to who next?
 A. Larry Potter.
 Q. How long were you married to him?
 A. Just a few months.
 Q. Then you married who?
 A. Jim Nix.
 Q. That is the one that testified here?
 A. Yes, sir.
 Q. I believe he said that you all were married forty-five days?
 A. Yes, sir. Just a little short while.
 Q. Then who did you marry?
 A. Joe Woods, just for seven days.
 Q. Seven days?
 A. Yes, sir.
All tolled, Gerlach has been married thirteen times.
Gerlach has a long history of severe occipital and migraine headaches. For these and other ailments she takes a panoply of prescription drugs. She regularly mixes *Page 77 
these prescription drugs with alcohol. It is common for Gerlach to abruptly become hysterical. Gerlach regularly experiences hallucinations such as spiders on the wall or monkeys crawling on the ceiling and appears to operate constantly under a belief in, and deference to, certain ghosts. Throughout her life, Gerlach has been a regular victim of wife-beating. She had frequently attempted suicide. The sheer number of witnesses — both defense and State witnesses — leave really no doubt at all that Gerlach is seriously mentally disturbed.
Contrary to this plethora of evidence that Gerlach is "crazy" and specific testimony that Gerlach was insane at the time of the shooting, four witnesses gave testimony favorable to the State's contention that Gerlach knew the difference between right and wrong on the night Kietzer was shot. Laura Markham, Gerlach's nextdoor neighbor, observed Gerlach on that fateful night and was of the opinion that Gerlach knew the difference between right and wrong. Michael Hurley, an investigator with the Harrison County Sheriff's Office, also observed Gerlach that night and believed Gerlach knew the difference between right and wrong. Darlene Kirby, a phone dispatcher with the Gulfport Police Department who handled Gerlach's call to the police, was of the opinion that Gerlach knew the difference between right and wrong. Finally, Dr. Henry Maggio, the court-appointed psychiatrist, found no psychotic processes evident in Gerlach.
Prior to trial, a motion had been filed by the State to have the jury sequestered. This motion was not granted and on Friday evening of January 22nd — following the Tuesday, January 19th commencement of the trial — Juror Carvin received an anonymous phone call informing her that Mary Ann Gerlach had once "put a contract out on a man". Following a discussion regarding this jury tampering among counsel, the trial judge and Carvin, the record reveals:
 (WHEREUPON THE JUROR CARVIN WAS RETURNED TO THE JURY ROOM AND A DISCUSSION WAS HELD IN THE JUDGE'S CHAMBERS BETWEEN THE ATTORNEYS FOR BOTH SIDES AND THE JUDGE.)
Juror Carvin remained on the jury and the record does not reveal whether either side objected to her continuing in this manner.
After hearing the evidence and being duly instructed, the jury on January 28, 1982, returned a verdict finding Mary Ann Gerlach guilty of murder and on the same day she was sentenced to life imprisonment in the custody of the Mississippi Department of Corrections as required by law. Miss. Code Ann. § 97-3-21 (Supp. 1984).
Gerlach timely moved the court for a new trial and after having had the matter under advisement for some several months, the Circuit Court on May 4, 1982, overruled and denied the motion. This appeal has followed.
 III. A. The Completeness Of A Hypothetical
When the district attorney asked Dr. Maggio — the State's expert psychiatrist — if he had an opinion regarding the sanity of Mary Ann Gerlach at the time of the shooting based upon Dr. Maggio's examination of her, defense counsel objected on the grounds that any such hypothetical must include "all of the evidence and testimony before the Court". The trial judge sustained this objection and prosecutor rephrased the question — as shown in the foregoing Section II of the Facts — to include a substantial amount of the bizarre history and behavior of Gerlach. Defense counsel again objected that the hypothetical was incomplete. The trial court overruled this objection and allowed Dr. Maggio to testify that he believed that Gerlach was sane when she committed the shooting.
On appeal, Gerlach contends that, unless the hypothetical question posed by the prosecutor included all undisputed evidence in the record to that point, it was an incomplete hypothetical and thus improper. Gerlach cites the case of Cates v. State,171 Miss. 106, 157 So. 95 (1934), which states: *Page 78 
 Where the facts are conflicting, the party producing expert may state the facts in accordance with his theory of them, assuming them to be true for the purpose of the argument. He is not authorized to omit material evidence bearing on the issue and calculated to influence the decision of the issue, but he must state these facts, where they are not disputed.
 171 Miss. at 124, 157 So. at 100.
Cates is really the only case Gerlach attempts to hang her hat on. This reliance on Cates is clearly misplaced, however.Cates itself goes on to observe:
 If there had been a fair and full effort to embrace all the facts, and, through oversight, some of the material facts were omitted, then the objecter should be required to state such omitted facts so that the court might see where they had any material bearing on the issue being tried.
 171 Miss. at 125, 157 So. at 100-01.
The upshot of Cates' reasoning is that a party may not purposefully omit undisputed material facts in order to elicit from an expert an opinion which has really no bearing on the actual facts of the case, but which is given merely improperly to influence or mislead the jury.
Subsequent cases — cases which cite Cates — make clear that "[i]t is not imperative that hypothetical questions cover all the undisputed facts in evidence . . . [t]he form of an hypothetical question is a matter within the sound discretion of the court."King v. State, 251 Miss. 161, 174, 168 So.2d 637, 642 (1964);see also Providence Washington Insurance Co. v. Weaver,242 Miss. 141, 153, 133 So.2d 635, 640 (1961) (trial court discretion); but see Magnolia Hospital v. Moore, 320 So.2d 793, 798 (Miss. 1975) (no modification made to the strong Cates
language); Mississippi Power Co. v. Harrison, 247 Miss. 400, 417-18, 152 So.2d 892, 900 (1963) (same).
We hold that the question posed in this case fairly summarized the relevant facts. It was not necessary that every minute undisputed detail be included. Defense counsel, of course, was free on cross-examination to inquire whether Dr. Maggio's opinion would change if certain additional facts were added, and counsel took full advantage of this opportunity.
The assignment of error is without merit and is denied.
 B. Tampering With Juror Carvin
Prior to the approval by this Court of the Uniform Criminal Rules of Circuit Court Practice on August 15, 1979, the rule in Mississippi was that, where the crime charged is punishable by death or a maximum of imprisonment for life, the jury shall be sequestered and this right cannot be waived either by the attorney for the accused or at the discretion of the trial court.Cox v. State, 365 So.2d 627, 629 (Miss. 1978). This rule was changed by the Uniform Rules to allow the right to be waived.Barnes v. State, 374 So.2d 1308, 1309 (Miss. 1979) (construing Rule 5.07, Miss.Unif.Crim.R.Cir.Ct.Prac.). Gerlach urges thatCox is the better rule and that Barnes should be overruled.
Procedurally, Gerlach is in a difficult position: (1) she failed to request that the jury be sequestered; and (2) upon learning that the tampering with Juror Carvin occurred, Gerlach failed to place in the record any objection.[2] In fact, insofar as the record reflects counsel for Gerlach said nothing about the matter until several days later — after the jury's guilty verdict had been returned.
Appellate counsel for Gerlach obviously feel that the tampering with Carvin is a most significant issue. The matter is complicated by the inadequacy of the record which does not even reflect what rationale the trial judge employed in sending Juror Carvin back into the jury room.
 The general rule recognized by this Court, and applied to questions similar to that which is before us, is, that if the verdict was rendered under circumstances in which its purity might have been *Page 79 
affected, it must be set aside; if it could not have been affected, it will be sustained. [citation omitted].
 Ned and Taylor v. State, 33 Miss. 364, 372-73 (1857).
A more recent analogy is contained in Hines v. State,417 So.2d 924 (Miss. 1982), where the trial judge, in response to an allegation that a juror had been sleeping, investigated and determined that the juror had in fact been awake. 417 So.2d at 925. In light of the judge's finding, there was no error in the proceeding. Significantly, unlike in Gerlach's case, the trial judge placed in the record his reasons for leaving the juror on the jury. 417 So.2d at 925 n. 1.
It would appear that, if Gerlach had objected at trial to Carvin's remaining upon the jury on the grounds that the information in the telephone call would adversely prejudice Carvin's deliberations concerning Gerlach's guilt, then Carvin should have been taken off the jury and an alternate juror seated. In this context we note that the trial judge interrogated Juror Carvin extensively, and it appears without serious doubt that the juror understood her obligation to disregard the telephone call and to decide the case solely on the evidence presented in open court. Because the record fails to reflect a timely and adequate objection on the part of defense counsel, we deny the assignment of error.
 C. Legal Insanity
Gerlach's life has been essentially an odyssey of catastrophe and perversion. There can be little doubt but that she is decidedly psychotic — she is a textbook case. All of this evidence, however, runs smack dab into the M'Naghten rule which in laymen's terms states that: Just because you are crazy does not mean you are legally insane. See Laney v. State,421 So.2d 1216, 1218-1219 (Miss. 1982); Harvey v. State, 207 So.2d 108, 110-115 (Miss. 1968).
In the context of M'Naghten — given the fact that there is testimony on both sides of the issue — a jury's verdict on the insanity issue is essentially conclusive and unreviewable. Frostv. State, 453 So.2d 695, 698 (Miss. 1984); Groseclose v.State, 440 So.2d 297, 300-01 (Miss. 1983); Lias v. State,362 So.2d 198, 201 (Miss. 1978); Smith v. State, 245 So.2d 583, 585-86 (Miss. 1971).
As indicated above there is in this record lay testimony inferentially suggesting at the time in question Gerlach was sufficiently in possession of her faculties so that she knew the difference between right and wrong and was able to appreciate the nature and quality of her actions. When this is coupled with Dr. Maggio's opinion that Gerlach was legally sane, we are seen without authority to disturb the verdict of the jury. Groseclosev. State, 440 So.2d 297, 300-301 (Miss. 1983).
CONVICTION OF MURDER AND SENTENCE OF LIFE IMPRISONMENT AFFIRMED.
PATTERSON, C.J., WALKER and ROY NOBLE LEE, P.JJ., and HAWKINS, DAN M. LEE, PRATHER, SULLIVAN and ANDERSON, JJ., concur.
[1] Gerlach can neither confirm nor deny her participation in the shooting. She has no memory of the evening in question.
[2] Though the record is silent where the Carvin issue was decided, Carvin's remaining on the jury is assigned as error in the New Trial motion.