558 P.2d 905

**STATE of Arizona, Appellee,**

v.

**Alonzo PARKER, Jr., Appellant.**

No. 3202.

Supreme Court of Arizona,
In Banc.

Dec. 22, 1976.

Bruce E. Babbitt, Atty. Gen. by William J. Schafer, III, Chief Counsel, Ronald L. Crismon, Georgia B. Ellexson, Asst. Attys. Gen., Phoenix, for appellee.

Philip M. Haggerty, Phoenix, for appellant.

STRUCKMEYER, Vice Chief Justice.

This is an appeal from a conviction for first degree murder and a sentence of life imprisonment with no possibility of parole for 25 years. Judgment affirmed.

On November 4, 1974, Alonzo Parker, Jr., herein called the defendant, visited the home of the deceased, Sammy Sanders, and his girlfriend, Tina Farthing. While there, the three, together with Parker's girlfriend, drank wine and beer. There is evidence that all four became intoxicated. For reasons never fully explained, defendant either ran or was chased out of the house. He went to where his car was parked and procured a gun. Sanders, meanwhile, had left the house and went to the front gate, where he was shot twice and fatally wounded by defendant.

Defendant contends that the trial court erred in denying his motion for directed verdict as to the charge of first degree murder. He argues that the evidence clearly indicates that he could not have entertained the premeditation necessary to sustain a conviction for first degree murder. He bases this contention on the evidence introduced at trial as to his intoxication on the day of the killing, as well as on the psychiatric evidence of insanity. A court should, however, refuse to direct a verdict of acquittal whenever there is shown substantial evidence that the defendant committed the offense with which he is charged. *State v. Money,* 110 Ariz. 18, 24, 514 P.2d 1014, 1020 (1973); 17 A.R.S. Rules of Criminal Procedure, Rule 20. Hence, viewing the incident in a light most strongly in favor of sustaining the jury's verdict, the denial of a directed verdict was proper. *State v. Duke,* 110 Ariz. 320, 325, 518 P.2d 570, 575 (1974).

The State's evidence of a wilful, deliberate and premeditated murder was to this effect. Defendant had a loaded pistol either on his person or in his car. This, alone, has been held sufficient to show malice. *State v. Duke,* supra, at 325, 518 P.2d at 575; *State v. Intogna,* 101 Ariz. 275, 277, 419 P.2d 59, 61 (1966). After defendant went out to his car, Sanders stood, unarmed, by the front gate with his hands in his pockets. He did not make any threatening gestures. Defendant moved his car to the side of Sanders' house, and then left it and commenced shooting at Sanders. Since it is the jury's function to weigh the evidence as a whole, to resolve any inconsistencies therein and then to determine whether or not a reasonable doubt exists, we think the foregoing facts are sufficient to support

the denial of the request for a directed verdict. *State v. Money,* supra, 110 Ariz. at 25, 514 P.2d at 1021.

Defendant next contends that the State did not prove his sanity at the time of the slaying beyond a reasonable doubt.

The correct rule controlling here was set forth by this Court in *State v. Cooper,* 111 Ariz. 332, 334, 529 P.2d 231, 233 (1974):

"There is a presumption of sanity in every criminal case. To rebut that presumption and cause sanity to become an issue in the case, the defendant ·must introduce sufficient evidence to generate a doubt as to his sanity. *State v. Begay,* 110 Ariz. 200, 516 P.2d 573 (1973). If the evidence generates a reasonable doubt as to sanity, the burden falls upon the state to prove sanity beyond a reasonable doubt."

We think the jury could have believed that the evidence did not generate a reasonable doubt as to sanity. Doubts, if any, as to the defendant's sanity at the time he shot and killed Sanders arose out of the testimony of two psychiatrists. The jury was, however, free to believe or disbelieve the expert testimony, and if the jury chose to disbelieve such testimony, it could have found the defendant was sane *if* the evidence presented would allow it to reasonably entertain a theory resulting in a belief in defendant's sanity. *State v. Cano,* 103 Ariz. 37, 42, 436 P.2d 586, 591 (1968).

The State rigorously cross-examined both the defendant and his psychiatrists. This cross-examination raised doubts as to the weight to be given their testimony.

Defendant testified that the reason he carried a gun was for protection, and:

"Q. Let me read you a statement that was read by Officer Barker, Detective Barker: 'A whole lot of things going on inside so I left. He followed me out the gate. I went out to the gate. He came right behind me.'

Now you testified that he was following you.

'And I was trying to get out of the way. I'm going to leave now because you are not treating me right. I cut out. He was right behind me. He was pretty good strong man.'

Were you afraid of him?

A. Yes, I was.

Q. 'I was getting out of the way. I was trying to get to the weapon.' "

Defendant also testified in response to the question:

"Q. You know it's wrong to shoot people, don't you?

A. It's wrong of people to beat others up when you go to their house to try to have a good time with them."

The psychiatrist, Carl Wellish, for example, testified that the defendant did not know that to kill was wrong because he was suffering from delirium tremens. However, the doctor's testimony as to the defendant's condition was seriously weakened by this testimony:

"Q. Did he tell you that his DT's started two days after he was in jail?

A. Yes, he did.

\* \* \* \* \* \*

He also said they started before he was in jail \* \* \*.

\* \* \* \* \* \*

Q. You don't even know when they started, do you?

A. I don't.

Q. As a matter of fact, in reality you don't even know if he had them before, do you, prior to the incident.

A. No, I don't know. That's correct. I also don't know that he didn't have them."

A reading of the entire record convinces us that the jury could believe that the evidence did not generate a reasonable doubt as to the defendant's sanity. We think this is particularly true in the light of defendant's conduct on the morning of the day the offense was committed and the circumstances surrounding the actual homicide, all of which tend to negate the notion that defendant was then suffering from delirium tremens. "A jury may, of course, reject

expert opinion if it finds that the opinion was based on an incorrect view of the facts." *United States v. Ingman,* 426 F.2d 973, 977 (9th Cir. 1970).

█ The defendant's final argument is directed to the constitutionality of A.R.S. § 13–453. That section reads:

"A. A person guilty of murder in the first degree shall suffer death or imprisonment in the state prison for life, without possibility of parole until the completion of the service of twenty-five calendar years in the state prison, as determined by and in accordance with the procedures provided in § 13–454."

Defendant's position is that there is no logical legislative standard which would justify prohibiting a person sentenced to life imprisonment for the crime of first degree murder from receiving parole before he has served twenty-five years in prison. This is because "to allow release at the end of 25 years implies a legislative finding that persons can be rehabilitated and safely restored to society, even though they have committed the crime of first degree murder." Defendant also questions whether the twenty-five year requirement is contradictory in that it destroys any motivation which an inmate might have to achieve rehabilitation.

The objective of the statute is not only the rehabilitation of those convicted of first degree murder, but we think the statute also undeniably seeks to protect society from wanton killers by punishment commensurate with the crime. Nor do we think the statute's twenty-five year prohibition against parole constitutes "cruel and unusual punishment."

Judgment affirmed.

CAMERON, C. J., and HAYS, HOLOHAN and GORDON, JJ., concurring.