562 P.2d 726

The STATE of Arizona, Appellee,

v.

Herbert OVERTON, Appellant.

No. 3305.

Supreme Court of Arizona,
In Banc.

March 21, 1977.

Bruce E. Babbitt, Atty. Gen., by William J. Schafer, III, Chief Counsel, Cleon M. Duke, Asst. Attys. Gen., Phoenix, for appellee.

Gerald F. Moore, Phoenix, for appellant.

McFARLAND, Justice, Retired.

Herbert Overton was charged with the first degree murder of Robert Dorn, a Maricopa County Deputy Sheriff. A jury returned a verdict of guilty of murder in the second degree, and a timely appeal was filed. Jurisdiction was accepted pursuant to A.R.S. § 13–1711. Judgment and sentence reversed with directions to enter a judgment of not guilty by reason of insanity.

At 2:00 o'clock on the afternoon of August 31, 1965, Toyo Hikida, a ranch foreman, since deceased, was driving an automobile in the vicinity of the intersection of 91st and Glendale Avenues near Phoenix, Arizona. He testified at Overton's preliminary hearing on the charge of murder that as he approached the intersection he noticed Overton seated in a pickup truck talking to a uniformed police officer. A police car was parked behind the truck. Hikida testified he saw the officer standing on the driver's side of Overton's vehicle when suddenly the officer ran around the back of the truck and then to the opposite side. Overton emerged from the pickup truck holding a pistol pointed downward. The police officer drew his gun and fired possibly twice. Overton returned the fire, and the police officer then fired again. Overton received a minor wound in the chest, but Dorn, the police officer, died from the effect of a bullet wound in the head.

Overton left the scene of the shooting in the truck and drove to the home of a friend, Lena Dragoo, who lived in El Mirage, Arizona. A neighbor notified the police of Overton's presence. The police chief of El Mirage, Melvin Wilder, and several other officers went to the Dragoo home. Wilder approached the house and saw Overton standing inside "evidently waiting for me or someone to come to the front door." His hands were in plain sight at waist level, and empty. His first words were, "I surrender." Overton was then arrested.

At Overton's arraignment in the Superior Court on September 22, 1965, on the charge of murder, the county attorney requested a mental examination under then Rule 250 of the Rules of Criminal Procedure. The court appointed various qualified psychiatrists to examine Overton. On January 11, 1966, a hearing was held which resulted in a determination that Overton was incompetent to stand trial. Overton was committed to the state hospital for treatment. It was not until the 19th of May, 1975, that Overton was finally found competent to stand trial.

■ The sole question necessary to be answered for resolution of this case is whether the State, when the statutory presumption of sanity has been rebutted, may establish sanity by the opinion of lay witnesses whose opportunity for observation was not sufficient to conclude that defendant knew what he was doing was wrong.

■ We need not labor the point that Arizona has steadfastly adhered to the Rule of M'Naghten's Case as the test of legal sanity. To be responsible for his criminal act, a defendant must know the nature and quality of the act *and* that what he was doing was wrong. *State v. Begay*, 110 Ariz. 200, 201, 516 P.2d 573 (1973). If a defendant presents evidence sufficient to generate a reasonable doubt as to his sanity—either that defendant did not know the nature and quality of his act *or* that he did not know it was wrong—the burden shifts to the State to prove beyond a reasonable doubt that at the time of the commission of the offense the defendant was sane. *State v. Blazak,*

105 Ariz. 216, 218, 462 P.2d 84 (1969); *State v. Parker*, 113 Ariz. 560, 558 P.2d 905 (1976).

We have held that in order to sustain its burden of proof, the State may introduce opinion testimony of lay witnesses where such opinions are supported by personal observations or knowledge of the defendant's past conduct and history. *State v. Corley*, 108 Ariz. 240, 242, 495 P.2d 470 (1972); *State v. Coey*, 82 Ariz. 133, 139, 309 P.2d 260 (1957). In Jones on Evidence, the rule in regard to the admissibility of the testimony of nonexpert witnesses is set forth as follows:

"The opinion of a nonprofessional witness is not admissible, however, unless it is shown to be based upon the witness's own knowledge and observation of the person's appearance; and it is generally held that, before expressing an opinion, the witness must state the facts and circumstances on which his opinion is founded.

While no general rule can be laid down as to what may be deemed a sufficient opportunity for observation—this being a question for the jury in view of all the circumstances of the case, under proper instructions from the court there must have existed between the witness and the other an intimacy of such a character and duration as clearly to indicate that the witness's testimony is of some probative value." 2 Jones on Evidence, § 14.7 at 603.

■ Where there is competent lay testimony relating to sanity which is in conflict with expert medical testimony, the jury is free to accept the lay testimony as a basis for its verdict and reject the expert testimony. *State v. Parker*, supra, 558 P.2d at 907; *State v. Cano*, 103 Ariz. 37, 436 P.2d 586 (1968). But whether there is lay testimony or medical testimony or a combination of both, if a defendant has sufficient evidence to rebut the presumption of sanity, it is incumbent upon the State " * * * to establish beyond a reasonable doubt the converse; that is, that the defendant knew the nature and quality of his act *and* that he knew that what he was doing was

wrong." *State v. Begay*, supra, 110 Ariz. at 201, 516 P.2d at 574.

In this case, of the three court-appointed psychiatrists, two testified that Overton knew the nature of his act but that he did not know it was wrong. One of the two, Robert T. Dean, M.D., also testified that Overton "was not necessarily able to determine the quality of the act." The third psychiatrist, Harrison M. Baker, M.D., testified:

"Q. Doctor, do you have an opinion as to whether on August 31, 1965, at the ·time of the alleged murder, whether Herbert Overton knew the nature and quality of his acts; or, if he did know, whether he knew he was doing what was wrong?

A. Yes, I have an opinion.

Q. What is your opinion?

A. My opinion is that on the date in 1965 he did know the nature and quality of his act, but that he did not, because of his mental condition, know that the act was wrong."

Testimony of Lena Dragoo and her neighbor, Ruby Talley, was to the effect that Overton told them that the shooting occurred because "they were trying to take his trailer away because he owed taxes on it."

In addition, the defense presented the testimony of Frank B. McFadden, a Maricopa County Deputy Sheriff, who a week prior to the shooting, had been dispatched to either collect the delinquent taxes or seize Overton's trailer. McFadden stated that the defendant told him that he didn't have to pay taxes anymore. McFadden testified:

"I asked him who told him that and he said the Lord told him."

Officer McFadden stated that Overton was nervous and trembling, and:

"Q. * * * why didn't you collect the delinquent tax from Mr. Overton?

A. Well, at this time, he said he wasn't going to pay. And the amount was very small. And I brought the report back to—I believe it was Capt. Bas-

com (ph) at that time and told him the man, in my opinion, was disturbed."

To establish sanity, the State introduced the testimony of police officers who based their opinions on observations and interrogations *after* the commission of the crime. As an example, Police Officer Darrell Reinke testified:

"A. He looked very flushed, like, you know, he'd been—like I said previously, he'd been wounded and apparently had been in a gun fight. And other than that, he wasn't hysterical or anything like that, is what I meant.

\* \* \* \* \* \*

Q. Now, I take it then that what you mean by 'normal under the circumstances' was that he just wasn't berserk?

A. Right."

Another witness for the State, Deputy Sheriff Ralph Lake, testified that on the afternoon of August 31, 1965, he was present at a conference with the defendant and other officers. He did not personally speak with Overton at that time, but some five hours later he did talk with him. Lake was asked whether he had an opinion, based upon his observations, as to whether Overton was sane or insane.

"Yes, I do.

\* \* \* \* \* \*

I would say during the time I associated with the defendant he was sane."

Lake explained, in summing up his testimony on cross-examination regarding his opinion of Overton's sanity:

"A. I would say he appeared normal under the circumstances."

Then on redirect examination:

"Q. \* \* \* Would you explain again to the Court and jury your definition of sanity? You say you thought he was sane and your definition of sane, what do you mean by that?

A. Well, my opinion with regard to being sane would be talking normal, answering questions and not talking about

something way out in left field during a conversation."

The officer's opinion of the manifestations of insanity is, of course, correct insofar as it goes. Talking irrationally could be indicative of an unsound mind. But the converse, talking normally, does not negate the more subtle and insidious forms of insanity with which the mind may be possessed.

While the rule announced in *State v. Begay* supra, and *State v. Schantz*, 98 Ariz. 200, 403 P.2d 521 (1965), permits a lay witness to testify as to his opinion of sanity, such witnesses may not base their opinions upon a different or lesser standard than that legally required of a defendant to rebut the presumption of sanity. The support for a lay witness' opinion must arise out of facts which show that the defendant knew the nature and quality of his act and that he knew that what he was doing was wrong. Terminology such as he seemed "rational," or "normal," or that during a conversation he was "not talking about something way out in left field," does not contradict the positive testimony that defendant did not know that what he did was wrong and, therefore, the testimony of the State's witnesses does not fall within the perimeters of the M'Naghten Rule.

The Court does not by this decision change the rule that a jury may accept the testimony of lay witnesses and reject the testimony of medical experts. What we decide today is that if the State relies on lay testimony to establish sanity, there must have existed an intimacy between the witness and the defendant of such a character and duration that the witness' testimony is of probative value to establish that defendant knew the nature and quality of his act and that he knew it was wrong. We hold that as a matter of law the State failed to present sufficient competent evidence to rebut the evidence that Overton did not know that what he was doing was wrong.

It is ordered that the judgment of conviction is reversed with directions to enter a

judgment of not guilty by reason of insanity. The court shall order the County Attorney to commence civil commitment proceedings against Overton in accordance with Rule 25, Rules of Criminal Procedure, A.R.S. 17.

CAMERON, C. J., STRUCKMEYER, V. C. J., and HOLOHAN and GORDON, JJ., concur.

Note: Justice JACK D. H. HAYS did not participate in the determination of this matter. Justice ERNEST W. McFARLAND, Retired, was called to sit in his stead.