573 P.2d 60

**STATE of Arizona, Appellee,**

v.

**Jose D. SANCHEZ, Appellant.**

No. 3784.

Supreme Court of Arizona, En Banc.

Dec. 5, 1977.

Bruce E. Babbitt, Atty. Gen. by William J. Schafer, III and Thomas G. Bakker, Asst. Attys. Gen., Phoenix, for appellee.

Derickson, Kemper & Henze by James Hamilton Kemper and Tom Henze, Phoenix, for appellant.

HAYS, Justice.

Jose D. Sanchez, hereinafter appellant, was convicted by a jury of first degree murder. We have jurisdiction of his appeal from the judgment of guilt and sentence of life imprisonment, without possibility of parole for twenty-five years, pursuant to A.R.S. §§ 13–1711 and 12–120.21(A)(1).

The facts out of which this appeal arises are as follows.

On May 14, 1976 a Phoenix attorney named Stephen Becker was mortally wounded by appellant. The weapon was a .38 caliber revolver, with which appellant shot Becker five times. A sixth bullet did not hit Becker.

Becker, acting as attorney for his parents, had been engaged in purchasing property on which tax liens had been placed. Through a series of complicated legal maneuvers, appellant lost some property he owned to Becker's parents. Appellant learned of it in December, 1975, and testimony at trial clearly shows that from that time until the day of the fatal shooting, he became more and more obsessed with the loss of this land, what he felt was the unfair way in which he lost it, and the desire to recover it.

It was revealed through testimony at trial that appellant went from place to place, where he thought he might obtain assistance: a legal aid attorney, a secretary at the union hall, a state legislator, and even the governor of Arizona. His final stop the day of the shooting was a real estate commissioner's office.

Appellant's obstacles were great. He was a native of Mexico and spoke English very poorly. Because he was not an owner of record, he was never given notice of the sale of his property. The people he sought out could give him only one answer: in order to retrieve his property, he must repurchase it from the Beckers at a price he simply could not afford.

Appellant faced other frustrations: he was slowly going blind from advanced diabetes; he had been seriously injured in an industrial accident, and although receiving workmen's compensation, his family was still quite poor.

All these obstacles and frustrations began to focus, in great anger, on the Beckers and particularly their son, Stephen. As early as February, 1976, appellant began threatening the lives of the Becker family. He voiced these threats to numerous people who testified to that effect at trial. Finally, a threat to kill Stephen Becker became a reality, and appellant was charged with an open count of murder.

The only issue at trial was appellant's sanity. Before trial the court appointed Drs. Jacob B. Hoogerbeets and Leonardo Garcia-Bunel to examine appellant and determine his competency to stand trial and his competency at the time of the commission of the crime. Both doctors agreed appellant was competent to stand trial and that at the time of the crime he knew the nature and quality of his actions. However, both also initially agreed that at the time of the crime appellant did not know right from wrong. They so testified on direct examination at trial.

The state, at trial, introduced no expert medical witness to contradict their testimony. On cross-examination of the defense's experts, the following was elicited:

PROSECUTOR: Okay. Before I go into some of these little bits and pieces, now your statement was that on the day in question Mr. Sanchez's ability to determine right from wrong was impaired.

DR. HOOGERBEETS: Correct.

Q: You're not meaning to say by that that he just flat could not tell right from wrong, is that correct?

A: I would say it was substantially impaired.

Q: Okay, but is there any way to say with any certainty that he could not understand right from wrong?

A: I think everybody retains a certain amount of that, and I think Mr. Sanchez is no exception.

THE COURT: I'm sorry. I didn't hear the answer.

A: BY THE WITNESS: I think everybody retains a certain amount of ability to distinguish right from wrong, and Mr. Sanchez is no exception.

Dr. Hoogerbeets testified further:

PROSECUTOR: There's been testimony in the trial that when Mr. Sanchez came into the office of the victim that there was no gun readily visible and that it may have come from a stack of papers or from his waistband. Now, would concealing a weapon be consistent with his idea he did not want to be stopped in what he was doing?

A: BY THE WITNESS: It's possible.

Q: Would it be consistent that if someone knew he had a gun they might try to stop him?

A: Yes.

Q: Would that be consistent with his thinking that other people would think what he was doing was wrong?

A: I think that he probably—I shouldn't say probably—I think what Mr. Sanchez knew he was about to do was considered to be wrong by a number of people. I also believe that in his own mind he felt that what he was about to do was considered to be right by a number of other people including himself.

Q: So, at least to some extent he knew that some people would consider this wrong?

A: I think, yes, he weighed these things. He must have weighed them in his own mind for a long period of time.

On cross-examination, Dr. Garcia-Bunel testified:

Q: Okay. So he was in effect making a value judgment. It's just that based upon his thinking he came up with what,. you know, society would consider the wrong answer?

A: Obviously so.

Q: But with his delusional thinking he thought he was right?

A: Yes.

Q: Okay. Did you get any indication that he understood that other people might not agree with his decision?

A: He understood that.

Q: He did?

A: Well, I assume he understood that because he told me such things, for example, that he wanted to give himself up, and he was afraid if the police saw him with a gun they would shoot him so that, therefore, he left the gun somewhere as he was in Mr. Becker's office, not in an attempt at hiding it, in an attempt at not being seen with the gun so he would not be shot. So he actually—he told me he asked this lady in the elevator to call the police saying, "I had killed a man," so it follows that he knew according to the rules of men, his act was likely to be considered wrong.

Q: Okay. So he stated to you that it was his suggestion to the woman in the elevator to call the police?

A: Yes, sir.

And further:

Q: So it is possible at the time of the killing he was in one of his phases where he did not understand right from wrong or did feel guilt even though he was doing something he felt was right?

A: It is not only possible, I think it's highly likely that he was in a situation where he did not know that what he was doing was wrong. It is highly likely.

Q: But it is also possible that he did know it was wrong and did it anyway because he was mad?

A: It is a remote possibility, but it is possible, yes.

Q: Would you agree that the things that happened right on the day of the killing would be your most valuable indicators of his state of mind on that day?

A: Certainly.

Q: Now, there's been testimony in the course of this trial that when Mr. Sanchez got in the elevator with this secretary he told her, "I'm in trouble. My God, help me, I've just killed a man." Would that be consistent with him understanding he had done something wrong?

A: It would be consistent with his knowing he had done something wrong according to the law of men, yes.

Q: Do you feel that he really understood that according to the law of men he did something wrong?

A: If he made that statement obviously he must have known that or had some understanding of it.

Q: So even though he may feel that he personally was right or justified, by making this statement he still is indicating that he understands that the law of man is that he shouldn't kill?

A: That statement would indicate that.

Q: Okay. Would his statement then, that the police should be called also indicate his understanding of the law of man?

A: Yes.

Q: Okay. There's also been testimony that the secretary who met him in the elevator then took him back to her office and at one point he gave her $5 and said, "Give this to my wife, she will need it." Would that be consistent with his understanding that he would be held in custody for awhile and that he would not have an opportunity to give this to her?

A: It would be consistent with that. He never claimed or professed his being in jail to me—he never thought that that was something that wasn't expected.

Q: So, he did expect to end up in jail?

A: He expected something would be done to him.

And finally:

Q: Okay. So let me see if I'm stating this fairly now. It's your opinion that at the time of the killing he felt that killing Mr. Becker was right for him.

A: For him and to protect, as he said, many innocent people.

Q: Okay. But he also understood that killing was against the law of man and that something would be done to him in relation to this?

A: He knew that or had an understanding of that, yes.

The only issue raised in this appeal is the failure of the state to rebut, with competent evidence, appellant's proof of insanity. The argument is that appellant introduced the testimony of two psychiatrists to show he did not know right from wrong. The state, it is contended, introduced only lay witnesses to rebut that evidence and those were lay witnesses who were not competent under this court's opinion in *State v. Overton,* 114 Ariz. 553, 562 P.2d 726 (1977), to testify to appellant's ability to determine right from wrong.

The state responds with the position that appellant never properly presented an issue of insanity under Arizona law, but if he did, the state did rebut it beyond a reasonable doubt.

 A defendant is presumed sane. *State v. Sisk,* 112 Ariz. 484, 543 P.2d 1113 (1975). If, however, he presents evidence sufficient to generate a reasonable doubt as to his sanity, the burden shifts to the state to prove his sanity beyond a reasonable doubt. *State v. Overton, supra.* The state must then prove the defendant knew the nature and quality of his act and that he knew that what he was doing was wrong. *State v. Schantz,* 98 Ariz. 200, 403 P.2d 521 (1965), *cert. denied,* 382 U.S. 1015, 86 S.Ct. 628, 15 L.Ed.2d 530 (1966). That, of course, is the M'Naghten test, adhered to consistently in Arizona. *State v. Schantz, supra.*

■ We think appellant did raise a reasonable doubt as to his sanity, not only with his experts, but also with numerous lay witnesses who testified that they were of the opinion also that appellant did not know right from wrong, that appellant was "not himself" during this period from December, 1975 to May, 1976, and that appellant would not or could not be reasoned with on the subject of his property and the Becker family. Such lay testimony is, of course, admissible on the issue of sanity if the witness has had an opportunity to observe the past conduct and history of a defendant. *State v. Coey,* 82 Ariz. 133, 309 P.2d 260 (1957).

The issue then becomes, did the state rebut, with competent evidence, appellant's evidence of insanity? Appellant argues that the state's failure to call expert medical witnesses to rebut the evidence of insanity is fatal to the state's case. He contends the state introduced only lay opinions—those of a police officer and the real estate commissioner—to the effect that appellant did know right from wrong. Under *Overton, supra,* their testimony is insufficient, appellant argues, because there was no "intimacy between the witness and the defendant of such a character and duration that the witness' testimony is of probative value . . . ." *State v. Overton,* 114 Ariz. at 556, 562 P.2d at 729.

■ That may or may not be true here, but we do not think it necessary to determine. There is no inference, as a matter of law, that a defendant's insanity is established because the state fails to call expert medical witnesses to rebut those of the defense. Such an inference may arise, and the jury may be instructed that they may so find, but it is not required that they do so. *State v. Corley,* 108 Ariz. 240, 495 P.2d 470 (1972). The jury here was, in fact, so instructed. Further, where the state elicits no testimony or evidence rebutting the doubt raised as to a defendant's insanity, a conviction is erroneous. *State v. White,* 110 Ariz. 508, 520 P.2d 1132 (1974).

*Overton, supra,* does not change these premises in Arizona law. It merely adds that, when the state relies solely on lay testimony to establish sanity,

"there must have existed an intimacy between the witness and defendant of such character and duration that the witness' testimony is of probative value to establish that defendant knew the nature and quality of his act and that he knew it was wrong." 114 Ariz. at 556, 562 P.2d at 729.

Here, the state did not rely solely on the opinion of lay witnesses. The appellant's experts themselves testified, as is obvious from the above-quoted portions of their testimony, that appellant's words and actions were consistent with his knowing right from wrong, despite his delusional thinking at other times. The jury was free to believe or disbelieve the testimony of the experts and find the defendant sane

"*if* the evidence presented would allow it to reasonably entertain a theory resulting in a belief in defendant's sanity." *State v. Parker,* 113 Ariz. 560, 562, 558 P.2d 905, 907 (1976).

Beside the experts' equivocations, there was substantial evidence from which the jury could determine appellant was sane: his preparation for the crime by having his gun repaired, his refusal to promise his priest he would not kill Stephen Becker, his concealment of the gun before and after the crime, his making his wife leave the scene before he went to Becker's office to kill him, his statements before, during and after the crime. All these things could very reasonably convince a jury, beyond a reasonable doubt, that appellant was sane and committed this crime in a premeditated, wilful and deliberate manner.

The jury was properly instructed that "wrong" in connection with the M'Naghten test meant "wrong according to the generally accepted moral standards of the community and not the defendant's own individual moral standards." *State v. Corley, supra.* We will uphold their verdict when sufficient evidence is introduced to support a theory of the case establishing the defendant's sanity beyond a reasonable doubt. *State v. Sisk, supra.*

We have examined the record for fundamental error and find none.

The judgment of conviction and the sentence are affirmed.

CAMERON, C. J., STRUCKMEYER, V. C. J., and HOLOHAN and GORDON, JJ., concur.