NOTICE: NOT FOR OFFICIAL PUBLICATION.
UNDER ARIZONA RULE OF THE SUPREME COURT 111(c), THIS DECISION IS NOT PRECEDENTIAL
AND MAY BE CITED ONLY AS AUTHORIZED BY RULE.

IN THE

# ARIZONA COURT OF APPEALS
## DIVISION ONE

STATE OF ARIZONA, *Appellee,*

*v.*

JORGE ESPINOZA, *Appellant.*

No. 1 CA-CR 15-0472
FILED 6-14-2016

Appeal from the Superior Court in Yuma County
No.  S1400CR201300594
The Honorable David M. Haws, Judge

**AFFIRMED**

COUNSEL

Arizona Attorney General's Office, Phoenix
By Joseph T. Maziarz
*Counsel for Appellee*

Yuma County Public Defender's Office, Yuma
By Edward F. McGee
*Counsel for Appellant*

Jorge Espinoza, San Luis
*Appellant*

---

## MEMORANDUM DECISION

Judge Kenton D. Jones delivered the decision of the Court, in which Presiding Judge Diane M. Johnsen and Judge Patricia A. Orozco joined.

---

**J O N E S**, Judge:

**¶1**        Jorge Espinoza appeals his convictions and sentences for one count of negligent homicide, six counts of endangerment, and six counts of criminal damage.  After searching the entire record, Espinoza's defense counsel has identified no arguable question of law that is not frivolous.  Therefore, in accordance with *Anders v. California*, 386 U.S. 738 (1967), and *State v. Leon*, 104 Ariz. 297 (1969), defense counsel asks this Court to search the record for fundamental error.  Espinoza thereafter filed a supplemental brief *in propria persona*.  After reviewing the record, we find no error.  Accordingly, Espinoza's convictions and sentences are affirmed.

### FACTS[1] AND PROCEDURAL HISTORY

**¶2**        Around 4:30 p.m. on May 6, 2013, Espinoza began his shift as a commercial truck driver hauling petroleum products.  After completing a pre-trip inspection of the tanker truck, he began driving from Yuma to Phoenix.  At the same time, emergency personnel and various officers with the Arizona Department of Public Safety (DPS) responded to an unrelated single-vehicle rollover accident on eastbound Interstate 8 outside of Yuma.

**¶3**        At the accident scene, Officer Tim Huffman reported to Captain Anderson that a teenage girl was texting on her cell phone when she rear-ended another vehicle, causing her to lose control and roll over onto the shoulder.  The local fire department had arrived to provide emergency assistance.  The girl was airlifted to the hospital, and Huffman asked Anderson to block the far right lane of travel so the occupants of the other involved vehicle could be safely loaded into the waiting ambulance.

---

[1]        We view the facts in the light most favorable to sustaining the jury's verdicts, with all reasonable inferences resolved against the defendant. *State v. Harm*, 236 Ariz. 402, 404 n.2, ¶ 2 (App. 2015) (quoting *State v. Valencia*, 186 Ariz. 493, 495 (App. 1996)).

¶4            Captain Anderson backed up his patrol vehicle approximately one hundred and fifty feet, parked diagonally across the outside lane with his emergency lights activated, and, wearing his DPS-issued reflective vest, manually directed drivers to merge left, away from the accident scene. Officer Simpson stood in the outside lane farther down the highway to prevent motorists from moving back into the right lane too soon. By this time, several vehicles driven by individuals working at the accident scene were lined up on the shoulder of the highway, including one involved in the original accident, plus an ambulance, a fire truck, three DPS patrol vehicles, and the ambulance company chief's personal pick-up truck, all of which were equipped with and operating their emergency lights.

¶5            It was a clear day, and traffic was complying with Captain Anderson's direction to merge left. After a few minutes, Anderson and Officer Simpson observed a commercial tanker truck approaching the accident scene in the outside lane. When the driver did not respond to Anderson's direction to merge left, Anderson became frantic, "jumping up and down and waiving [his] arms trying to get [the driver's] attention." At some point, Anderson realized the truck driver could not respond in time to avoid a collision and ran off the road just in time to avoid being hit. Both Anderson and Simpson testified the driver never looked up, never slowed down, and never took any evasive action.

¶6            Immediately thereafter, there was a "tremendous explosion . . . like a train, a freight train came through there" as the twelve-ton tanker truck, still traveling sixty-five miles per hour, collided first with Captain Anderson's patrol vehicle and then with Officer Huffman's patrol vehicle. Officer Simpson, as well as emergency medical personnel on scene, including Barry A., John N., Cody P., and Donald P., all testified they heard the noise and watched as the truck skidded sideways toward them, jack-knifed, and crushed the pick-up truck and Simpson's patrol vehicle into the fire truck, throwing up a cloud of dust and debris. Anderson quickly discovered Huffman in his patrol vehicle — now an unrecognizable "mangled ball of metal" — gasping for breath and crushed against the dashboard. Huffman died from blunt force trauma and internal injuries before he could be extricated from the vehicle. The tanker truck contained volatile gasoline fumes, and the scene was closed for more than six hours while the hazmat team worked to evaluate and eliminate the attendant dangers before further investigation took place.

¶7            The State's accident reconstructionist later testified there was no indication Espinoza attempted to brake prior to the collision, although the post-collision inspection revealed his brakes were in good working

order. Espinoza did not exhibit any signs of impairment from drugs or alcohol and did not report any mechanical issues with the tanker truck. When questioned, Espinoza explained he had been distracted by another commercial truck moving in front of him when the collision occurred. He stated he had a cell phone, but his employer did not allow cell phone use while driving and it was in his pants pocket at the time. Espinoza's employer confirmed cell phone use while operating a commercial vehicle on a highway is prohibited both by federal regulation and company policy and that Espinoza received training on this restriction, defensive driving techniques, and how to avoid distractions, as well as the general dangers of hauling, loading, and unloading petroleum products.

¶8　　　　The tanker truck was equipped with a video camera mounted to the windshield that captured video of both inside and outside the cab for the eight seconds immediately preceding and four seconds immediately following the collision. The inside view was partially blocked by a wallet and cardholder wedged into a recess in the dashboard so that only Espinoza's right cheek and right arm from shoulder to wrist were visible. Therefore, it was impossible to determine where Espinoza was looking or whether his hands were on the steering wheel prior to the collision. However, the position of his head did not change during the eight seconds prior to the collision despite testimony that, under the conditions, the accident scene was visible at least thirty seconds away.

¶9　　　　Espinoza did not react until he collided with Captain Anderson's patrol vehicle. Upon impact, the wallet was dislodged, and an object consistent with the size, shape, and color of Espinoza's cell phone flew across the screen. The accident reconstructionist testified the direction of travel of the object indicated it had been in "the general torso area of the driver" upon impact. Nothing of similar size or shape as that object was later found within the cab, which was generally well-kept and free of debris. And, neither the inside or outside views depicted another commercial vehicle traveling near Espinoza at impact.

¶10　　　　Upon cursory examination, the cell phone did not reflect any phone calls or text messages around the time of the collision: 5:10 p.m. Further investigation by a computer forensics agent with the Office of Homeland Security revealed three text messages sent and other user-initiated activity through the Facebook application and Facebook messenger between 4:53 and 5:05 p.m. on the day of the incident. The phone was not connected to any Bluetooth devices and the misspellings and slang indicated it had not been operated via voice command. Based upon

this information, the agent testified Espinoza's cell phone was not in his pocket while he was driving.

¶11        Espinoza's cell phone also contained evidence of twenty-six cached files created by the Facebook application between 5:08:32 and 5:09:16 p.m. on May 6, 2013.  The computer forensics agent was unable to determine whether those files were indicative of user-initiated activity because the files themselves were deleted automatically when the application was closed later that evening.  However, no additional cache files were created after the approximate time of the collision.

¶12        The vehicles involved in the collision were severely damaged. The damage to the rear of the firetruck totaled more than $19,000.  All three DPS patrol vehicles were damaged, with losses estimated between $5,000 and $20,000.   The pick-up truck was a total loss, exceeding $20,000. Espinoza's employer received more than $140,000 from its insurance company for the damage to the tanker truck.

¶13        Espinoza was charged with one count of second degree murder, thirteen counts of endangerment, and six counts of criminal damage.  A sixteen-day jury trial began in January 2015.  At the conclusion of the State's case-in-chief, Espinoza's counsel moved unsuccessfully for judgment of acquittal pursuant to Arizona Rule of Criminal Procedure 20(a).

¶14        The jury found Espinoza guilty of the lesser-included offense of negligent homicide, six counts of endangerment,[2] and six counts of criminal damage to the three DPS patrol vehicles, firetruck, pick-up truck, and tanker truck.  Espinoza filed a motion for new trial, arguing he was, at most, civilly responsible, the evidence was insufficient to establish recklessness, and the jury's verdicts were inconsistent because its acquittal of Espinoza for second-degree murder and manslaughter precluded a finding that he acted recklessly for purposes of endangerment.  The motion was denied.

¶15        After a mitigation hearing, Espinoza was sentenced as a non-dangerous, non-repetitive offender to a slightly mitigated term of imprisonment on each count.  The sentences for the six counts of criminal damage were ordered to be served concurrently, and the sentences for the

---

[2]        The jury found Espinoza guilty of endangering Captain Anderson, Officer Simpson, and four emergency medical personnel:  Barry A., John N., Cody P., and Donald P.

remaining counts to be served consecutive to the criminal damage counts and each other. In total, Espinoza was sentenced to six years' imprisonment and given credit for 153 days of presentence incarceration. Espinoza timely appealed. We have jurisdiction pursuant to Arizona Revised Statutes (A.R.S.) sections 12-120.21(A)(1),[3] 13-4031 and -4033(A)(1).

## DISCUSSION

### I.    Jury Bias

**¶16**        Espinoza argues the trial court erred and caused him prejudice by failing to strike ten jurors for cause. Espinoza did not use peremptory strikes against any of these jurors, and they were all ultimately empaneled.

**¶17**        Generally, we review the denial of a motion to strike a juror for cause for an abuse of discretion. *State v. Cruz*, 218 Ariz. 149, 158, ¶ 28 (2008) (citing *State v. Glassel*, 211 Ariz. 33, 47, ¶ 46 (2005), and *State v. Medina*, 193 Ariz. 504, 511, ¶ 18 (1999)). Where the defendant does not move to strike the juror for cause, we review only for fundamental error. *Id.* at 159, ¶ 31 (citing *State v. Garza*, 216 Ariz. 56, 64, ¶ 28 (2007)). It is the burden of the defendant to prove both that error exists and that such error was prejudicial. *State v. Henderson*, 210 Ariz. 561, 567, ¶¶ 19-20 (2005). "Reversal is not required if a fair and impartial jury was ultimately empaneled." *Garza*, 216 Ariz. at 63, 65, ¶¶ 20, 32 (citing *State v. Hickman*, 205 Ariz. 192, 197, ¶ 22 (2003)).

### A.    Prior News Reports

**¶18**        Espinoza argues Jurors 1, 2, 3, 10, 14, 16, and 18 should have been excused because they were exposed to media coverage of the case prior to jury selection. Espinoza's counsel only moved to strike Jurors 1, 10, and 14 on this basis; he did not object to the inclusion of the others on the jury panel.[4]

**¶19**        Although Jurors 1, 2, 3, 10, 16, and 18 reported seeing news reports and/or video clips of the collision on the television, in the newspaper, or on Facebook, none recalled the story with any particular

---

[3]      Absent material changes from the relevant date, we cite a statute's current version.

[4]      Juror 16 was ultimately chosen as an alternate and did not participate in deliberations.

detail. Additionally, none of these jurors discussed or heard any editorial comments regarding the case or the cause of the collision or formed any opinions about what had happened. Juror 14 testified that, when the collision first occurred, he had discussed the case at some length with his friends "trying to hash out how it could happen." Despite these discussions, Juror 14 assured the trial court he did not form any definite opinions about what had happened, and he would be able to make a decision based only upon the evidence presented during trial. The other jurors likewise agreed they had "no reservations" regarding their ability to serve as fair and impartial jurors.

**¶20**        Although we acknowledge the possibility that prejudice could result from a venireperson's prior exposure to information in a highly publicized case, "mere knowledge of or opinions about the case do not disqualify a juror who can set them aside and decide based on the evidence presented at trial." *State v. Payne*, 233 Ariz. 484, 500, ¶ 31 (2013) (citing *Cruz*, 218 Ariz. at 156-57, ¶ 14). Our review of the record reveals the trial court acted within its discretion in concluding each of the challenged jurors would be able to lay aside prior impressions or opinions, if indeed he actually had any, render a verdict based solely upon the evidence presented in court, and act fairly and impartially. *See State v. Reasoner*, 154 Ariz. 377, 384 (App. 1987) (holding the trial court does not err in refusing to strike a juror for cause "when he ultimately assures the court that he can be objective") (citing *State v. Davis*, 137 Ariz. 551, 558 (App. 1983)). Moreover, the jurors were instructed to consider only the evidence presented and to use their common sense in determining Espinoza's guilt or innocence, and we presume they did as instructed. *State v. Peraza*, 239 Ariz. 140, 146, ¶ 23 (App. 2016) (citing *State v. Newell*, 212 Ariz. 389, 404, ¶ 68 (2006)). We therefore find no error, fundamental or otherwise. *See State v. Atwood*, 171 Ariz. 576, 632 (1992) (finding no prejudice where half of the jurors had "minimal" media exposure, but indicated it would not interfere with their ability to serve as fair and impartial jurors); *cf. Payne*, 233 Ariz. at 500, ¶ 32 (finding no prejudice to defendant in the denial of a request to change venue where seven of twelve jurors who deliberated were exposed to media reports, five of the seven reported "very little" exposure, and all seven assured the court they could disregard the information they had seen) (citation omitted).

### B.        Acquaintance with Judge, Prosecutor, and Witnesses

**¶21**        Espinoza argues Jurors 5, 6, and 14 should have been excused because they personally knew the prosecutor, judge, and/or law

enforcement witnesses.[5]  Espinoza's counsel's motion to strike Juror 14 was denied; he did not object to the inclusion of Jurors 5 and 6 on the jury panel.

¶22           During jury selection, Juror 5 stated she used to babysit one of the investigating officers when he was young because their mothers were good friends, but now "rarely ha[s] contact with him."  She added that she last saw the officer two years ago at her mother's funeral and would not give greater weight to his testimony simply because she knew him.  To the contrary, Juror 5 stated she "would be very objective."  She also stated she "believe[d a defendant is] innocent until found guilty."

¶23           Juror 6 stated she knew the prosecutor and Officer Simmons because their children had played on sports teams together in the past.  Juror 6 also knew the prosecutor's son when he was in fifth grade twelve or thirteen years prior to the trial and was currently a member of a weight loss club with Simmons.  When questioned, Juror 6 expressed her belief she could be a fair and impartial juror.

¶24           The trial court judge acknowledged he knew Juror 14 "quite well" because the two refereed basketball games together — games which the prosecutor had "probably" attended.  Neither the judge nor the prosecutor indicated this prior contact created a conflict.  And, Juror 14 testified he would be able to make a decision based only upon the evidence presented during trial as an impartial juror.

¶25           Knowledge of or acquaintance with a trial participant may call a juror's objectivity into question, but it does not automatically warrant disqualification.  *See State v. Hill*, 174 Ariz. 313, 319-20 (1993) (citing *State v. Pawley*, 123 Ariz. 387, 389 (App. 1979), and *State v. Brosie*, 24 Ariz. App. 517, 520-21 (1975)).  In assessing whether cause exists to strike a juror based upon his relationship with a participant in the trial, the court must consider the nature of the relationship and its effect upon the juror's ability to properly assess the testimony.  *See State v. Bible*, 175 Ariz. 549, 574 (1993) (citing *State v. MacDonald*, 110 Ariz. 152, 153-54 (1973), *State v. Garcia*, 102 Ariz. 468, 469-71 (1967), and *State v. Ortiz*, 117 Ariz. 264, 267 (App. 1977)).  Given the attenuated connections between the jurors and the trial participants and the jurors' assurances they would be fair and impartial, the

---

[5]      Espinoza also argues Juror 11 should have been excused on this basis.  However, there is no evidence in the record that Juror 11 had any prior knowledge of the trial participants, and the defense motion to strike, which was denied, was based solely upon his health issues.

trial court did not abuse its discretion in determining the circumstances did not warrant dismissal from jury service.

## II.    Right to Counsel

¶26    Within his supplemental brief, Espinoza argues his constitutional right to counsel was violated when he was arrested immediately after refusing to speak with law enforcement without his attorney present.  But, Espinoza does not allege the arresting officer elicited any incriminating statements from him following invocation of his right to counsel.  Nor does he argue the officer otherwise lacked probable cause to effectuate the arrest.  We find no error.

## III.    Sufficiency of the Evidence

¶27    Espinoza also argues he lacked criminal intent to commit the offenses, alleges the collision occurred because law enforcement and emergency medical personnel did not take appropriate steps to control traffic around the original accident scene, and asserts there were inconsistencies in the evidence regarding other traffic on the highway at the time of the collision.  We construe these arguments as a challenge to the sufficiency of the evidence to support the convictions.  We review the sufficiency of the evidence *de novo* and will reverse "only where there is a complete absence of probative facts to support the conviction." *State v. Soto-Fong*, 187 Ariz. 186, 200 (1996) (quoting *State v. Scott*, 113 Ariz. 423, 424-25 (1976)).  We do not reweigh the evidence, and we defer to the jury's resolution of any inconsistencies in the evidence.  *See State v. Parker*, 113 Ariz. 560, 561 (1976) ("[I]t is the jury's function to weigh the evidence as a whole, to resolve any inconsistencies therein and then to determine whether or not a reasonable doubt exists.").

¶28    As relevant here, "[a] person commits negligent homicide if with criminal negligence the person causes the death of another person." A.R.S. § 13-1102(A).  Criminal negligence occurs in this context when "a person fails to perceive a substantial and unjustifiable risk" of death.  *See* A.R.S. § 13-105(10)(d).  "A person commits endangerment by recklessly endangering another person with a substantial risk of imminent death or physical injury."  A.R.S. § 13-1201(A).  And, criminal damage occurs when a person "[r]ecklessly defac[es] or damag[es] property of another person." A.R.S. § 13-1602(A)(1).  "Recklessly" means "a person is aware of and consciously disregards a substantial and unjustifiable risk that the result will occur."  A.R.S. § 13-105(10)(c).

¶29        Here, evidence was presented upon which the jury could determine beyond a reasonable doubt that Espinoza was an experienced, commercial truck driver who received extensive safety training regarding the general dangers of driving, as well as the specific dangers of hauling petroleum products, and that he disregarded the risk of catastrophic injury to persons or property when he used his cell phone while driving a tanker truck sixty-five miles per hour on the highway.  As a result of this conduct, he caused the death of Officer Huffman, caused almost two hundred thousand dollars of property damage, and put everyone at the accident scene at risk of injury or death.  Although Espinoza presented evidence to support his defenses, the resolution of conflicts is solely within the province of the jury.  Sufficient evidence supports Espinoza's convictions, and we find no error.

## IV.    Unanimous Verdict

¶30        Espinoza also argues his convictions should be vacated because the jury failed to return a unanimous verdict.  However, although the jury was unable to agree that the State proved any aggravating factors, the record reflects the verdicts themselves were unanimous.  We find no error.

## V.    Fundamental Error Review

¶31        Further review reveals no fundamental error.  *See Leon*, 104 Ariz. at 300 ("An exhaustive search of the record has failed to produce any prejudicial error.").  All of the proceedings were conducted in compliance with the Arizona Rules of Criminal Procedure.  So far as the record reveals, Espinoza was represented by counsel at all stages of the proceedings and was present at all critical stages including the entire trial and the verdict. Ariz. R. Crim. P. 26.9.

¶32        The jury was properly comprised of twelve jurors, and the record shows no evidence of jury misconduct.  *See* Ariz. Const. art. 2, § 23; A.R.S. § 21-102(A); Ariz. R. Crim. P. 18.1(a).  At sentencing, Espinoza was given an opportunity to speak, and the trial court stated on the record the evidence and materials it considered and the factors it found in imposing sentence.  Ariz. R. Crim. P. 26.10.  Additionally, the sentence imposed was within the statutory limits.  *See* A.R.S. §§ 13-702(D), -711(A).

**CONCLUSION**

**¶33**          Espinoza's convictions and sentences are affirmed. Defense counsel's obligations pertaining to Espinoza's representation in this appeal have ended. Defense counsel need do no more than inform Espinoza of the outcome of this appeal and his future options, unless, upon review, counsel finds an issue appropriate for submission to our supreme court by petition for review. *State v. Shattuck*, 140 Ariz. 582, 584-85 (1984).

**¶34**          Espinoza has thirty days from the date of this decision to proceed, if he wishes, with an *in propria persona* petition for review. *See* Ariz. R. Crim. P. 31.19(a). Upon the Court's own motion, we grant Espinoza thirty days from the date of this decision to file an *in propria persona* motion for reconsideration.



Ruth A. Willingham · Clerk of the Court
FILED: AA