**LAWRENCE KING, Appellant/Defendant**
**v.**
**PEOPLE OF THE VIRGIN ISLANDS, Appellee/Plaintiff**

S. Ct. Criminal No. 2015-0113

Supreme Court of the Virgin Islands

August 21, 2017

905

KELE C. ONYEJEKWE, ESQ., Office of the Territorial Public Defender, St. Thomas, USVI, *Attorney for Appellant.*

SU-LAYNE U. WALKER, ESQ., Assistant Attorney General, St. Thomas, USVI, *Attorney for Appellee.*

HODGE, *Chief Justice*; CABRET, *Associate Justice*; and SWAN, *Associate Justice.*

## OPINION OF THE COURT

### (August 21, 2017)

CABRET, *Associate Justice.* Lawrence King appeals the Superior Court's November 18, 2015 judgment and commitment, arguing that the Superior Court erred by sentencing King instead of finding him not guilty by reason of insanity. Because the People did not prove King's sanity beyond a reasonable doubt, we reverse the Superior Court's November 18, 2015 judgment and commitment, and remand this matter with instructions to enter a judgment of not guilty by reason of insanity on all counts.

## I. FACTUAL AND PROCEDURAL BACKGROUND

On April 1, 2015, King approached a building located at 2200 Percy DeJongh Drive, Estate Staabi, in St. Thomas. King demanded entry into the building. From behind a glass door, the owner of the building, Robert DeJongh, refused to grant King entry. King responded by picking up a 12-inch concrete paver from the parking lot area and throwing it through the glass door. He then attempted to reach through the broken glass and unlock the door from the inside, but abandoned his attempt and left the scene before the police arrived. When police officers arrived on scene, they made contact with DeJongh and inspected the premises. King then returned to the scene, and appeared agitated. The officers attempted to calm King down, but were unable to do so. The officers then arrested King.

By information dated April 15, 2015, the People charged King with burglary in the second degree, V.I. CODE ANN. tit. 14, § 443, destruction of property, 14 V.I.C. § 1266, disturbance of the peace, 14 V.I.C. § 622(1), and trespass, 14 V.I.C. § 1741. King was tried by a jury in the Superior Court on October 5, 2015.

At trial, the People called DeJongh and responding police officer Shawell Turnbull as witnesses. DeJongh testified concerning the chronology of events that occurred on April 1, 2015. Although he testified that he had been standing inside the building and was separated from King by a glass door, DeJongh explained that he heard King shout expletives and threaten to burn the building down if he was not granted entry. DeJongh testified that, on previous occasions, King had threatened to shoot him in the head, to cut his throat, to chop off his head, and to burn the building down. DeJongh testified that King had not always behaved this way, and that he initially met King "quite a number of years ago" while King was trying to organize a basketball league for his neighborhood. DeJongh testified that, "years later" their relationship changed after King began "stalking" and harassing him and his wife, and that King was no longer welcome at DeJongh's business as a result.

Officer Turnbull then testified. She stated that King appeared on the scene after she arrived, and that King was arguing with the officers, claiming that he owned DeJongh's business, and "mumbling all kind of different comments." Officer Turnbull further testified that King "was agitated. He look[ed] a little irritated and upset," and that despite trying to calm him down, King "continued arguing and making threatening gestures at . . . DeJongh."

After the People rested, King called Dr. Leighmin James Lu, who had evaluated King's mental condition. The People stipulated to his qualifications and certification as an expert in the field of neuropsychiatry, and the Court received Dr. Lu's June 9, 2015 psychiatric report into evidence without objection. Dr. Lu then testified that, when King was arrested on April 1, 2015, King "was suffering from the form of mental disorder, which is called paranoid condition or paranoia. And [King's] behavior and his act, the offense he committed was committed as a result of the mental disorder." He explained that, because of this disorder, King holds grandiose beliefs about himself, and in his own mind, honestly believed that he owned DeJongh's property.

During its cross-examination of Dr. Lu, the People elicited the fact that the only source of information for Dr. Lu's examinations was King himself, and that Dr. Lu did not consult any of King's family members in order to diagnose King. The People also elicited the fact that Dr. Lu used only one test to diagnose King, but that he did not use two other available tests. Finally, Dr. Lu conceded that King's act of gaining entry to a place from which he had been denied entry was evidence of a rational thought process.

On redirect-examination, Dr. Lu testified that, although King "understood the nature of the crime and offenses charged against him," he still held the "expert opinion" that King was suffering from a mental illness on April 1, 2015, and that King's acts on that date resulted from that illness.

On recross-examination, the People returned to questioning Dr. Lu about the thought process behind gaining entry to a building by force. Dr. Lu clarified that throwing a rock through a window is "a goal oriented result," and that the person throwing the rock could have done so "as a result of frustration, anger, not necessarily directly from the paranoid disorder." The People then asked Dr. Lu whether a threat to burn a building down could be the product of anger rather than the product of a mental disorder. Dr. Lu responded that it could be. The People then concluded their recross-examination, and King rested.

Before closing arguments, King stated that he had no objections to the proposed jury instructions, and did not request a specific jury instruction on the consequences of finding King not guilty by reason of insanity. The parties presented their closing arguments, and the Superior Court instructed the jury. King did not object to the instructions after they were given. The jury found King guilty on all counts.

On October 21, 2015, King moved for a judgment notwithstanding the verdict, arguing that the People had not proven his sanity beyond a reasonable doubt. After the Superior Court denied that motion during King's November 6, 2015 sentencing hearing, it entered a November 18, 2015 judgment and commitment and sentenced King. King filed a timely notice of appeal on November 18, 2015. *See* V.I. R. APP. P. 5(b)(1).

## II. JURISDICTION

"The Supreme Court [has] jurisdiction over all appeals arising from final judgments, final decrees or final orders of the Superior Court."

4 V.I.C. § 32(a). In a criminal case, the written judgment embodying the adjudication of guilt and the sentence imposed based on that adjudication constitutes a final judgment for purposes of this statute. *Williams v. People*, 58 V.I. 341, 345 (V.I. 2013) (collecting cases). Accordingly, the Superior Court's November 18, 2015 judgment and commitment is a final judgment over which we may exercise jurisdiction. *See Petric v. People*, 61 V.I. 401, 407 (V.I. 2014) (citations omitted).

## III. DISCUSSION

■ King challenges the sufficiency of the evidence to sustain his convictions, arguing that the People produced no evidence of his sanity during trial. King also challenges the propriety of the jury instructions given by the Superior Court, arguing that the Virgin Islands insanity statute obligates the Superior Court to instruct the jury on the consequences of entering a verdict of not guilty by reason of insanity, but that the Superior Court gave no such instruction. We agree that the People produced no evidence of King's sanity during trial, and that the Superior Court should instruct a jury on the consequences of entering a verdict of not guilty by reason of insanity when necessary to ensure that a defendant is adjudged on the People's proof, not on the misapprehension that a defendant will walk free if found not guilty by reason of insanity.

### A. Sufficiency of the Evidence

■ In evaluating the sufficiency of the evidence to sustain King's convictions, "we must view the evidence in the light most favorable to the People, and affirm the conviction[s] if any rational trier of fact could have found the essential elements of the crime[s] beyond a reasonable doubt." *Petric*, 60 V.I. at 407 (quoting *George v. People*, 59 V.I. 368, 384 (V.I. 2013)) (internal quotation marks omitted); *see Castor v. People*, 57 V.I. 482, 488 (V.I. 2012) ("An appellant who challenges the sufficiency of the evidence bears a very heavy burden." (quoting *Latalladi v. People*, 51 V.I. 137, 145 (V.I. 2009)) (internal quotation marks omitted)).

■ Under Virgin Islands law, "[a]ll persons are capable of committing crimes or offenses except . . . persons who are mentally ill and who committed the act charged against them in consequence of such mental illness." 14 V.I.C. § 14(4). If a defendant introduces "some evidence" that he was mentally ill and that he committed the charged offense as a result of that illness, the defendant's sanity becomes an element of that offense.

*See Petric*, 61 V.I. at 410 (explaining that a defendant need only introduce "a slight quantum of evidence" to shift this burden (citations and internal quotation marks omitted)); *accord Nibbs v. People*, 52 V.I. 276, 284-85 (V.I. 2009) (quoting *Gov't of the V.I. v. Webbe*, 821 F.2d 187, 189, 23 V.I. 449 (3d Cir. 1987)). With respect to each offense charged, the People must then prove beyond a reasonable doubt that the defendant either did not suffer from a mental illness, or was not acting as a result of his mental illness when he committed the charged offense, i.e., the People must prove beyond a reasonable doubt that the defendant was sane when he or she committed the offense. *Petric*, 61 V.I. at 410, 413; *Nibbs*, 52 V.I. at 291 & n.9; *see United States v. Marable*, 657 F.2d 75, 76 (4th Cir. 1981); *Wright v. United States*, 250 F.2d 4, 7, 102 U.S. App. D.C. 36 (D.C. Cir. 1957); *People v. Hill*, 934 P.2d 821, 828-29 (Colo. 1997) (en banc).

██ A psychiatrist's report and testimony constitute "some evidence" that a defendant suffered from a mental illness and committed acts as a result of that illness. *See, e.g., Petric*, 61 V.I. at 410; *Nibbs*, 52 V.I. at 290-92; *see also Buatte v. United States*, 330 F.2d 342, 344-45 (9th Cir. 1964) (psychiatrist's testimony constituted evidence that defendant was insane at the time of the charged offense, obligating the government to prove the defendant's sanity beyond a reasonable doubt); *State v. Milam*, 163 W. Va. 752, 260 S.E.2d 295, 302 & n.6 (1979) (psychiatrist's testimony that "there was a 'probability' or a 'good possibility' that the defendant was insane at [the] time [of the charged offense]" was "more than some evidence" of insanity). In this case, Dr. Lu was admitted as an expert in the field of neuropsychiatry, and King introduced Dr. Lu's psychiatric report into evidence, which diagnosed King with a paranoid disorder and concluded that King was "still actively psychotic," that he "was suffering from a form of mental disorder at the time of commitment of alleged offense, on or about [April 1, 2015], and [that] the alleged offenses were committed in consequence of the mental disorder." Dr. Lu reaffirmed this opinion twice during King's trial. Dr. Lu's report and testimony constitute "some evidence" that King suffered from a mental illness on April 1, 2015, and that his conduct on that date was a consequence of his mental illness, thereby making his sanity an element of the charged offenses.

█ Because King introduced this evidence, the prosecution was required to prove beyond a reasonable doubt that King was sane when he committed the offenses with which he was charged. *Petric*, 61 V.I. at 410;

*accord Buatte*, 330 F.2d at 345; *Beltran v. United States*, 302 F.2d 48, 52 (1st Cir. 1962); *Carter v. United States*, 252 F.2d 608, 615, 102 U.S. App. D.C. 227 (D.C. Cir. 1957). The People can accomplish this by presenting their own expert testimony. *See Petric*, 61 V.I. at 410-11 (collecting cases). The People may also prove a defendant's sanity through the testimony of lay witnesses who are familiar with the defendant and observed his behavior at or around the time of the offenses. *See id.* at 411-12 (collecting cases); *State v. Overton*, 114 Ariz. 553, 562 P.2d 726, 728 (1977) ("[I]n order to sustain its burden of proof, the State may introduce opinion testimony of lay witnesses where such opinions are supported by personal observations or knowledge of the defendant's past conduct and history. . . . Where there is competent lay testimony relating to sanity which is in conflict with expert medical testimony, the jury is free to accept the lay testimony as a basis for its verdict and reject the expert testimony." (citations omitted)).

██ Here, the People did not attempt to prove King's sanity through expert testimony, but instead, attempted to impeach Dr. Lu's conclusions on cross-examination. The People elicited testimony that Dr. Lu diagnosed King with "a very simple clinical symptom check list" comprised of 20 questions instead of the "MMPI" or the "MCMI III" tests.[1] But Dr. Lu explained that the MMPI is not the typical assessment used to diagnose the psychiatric disorder from which King suffers, and that the MCMI III is "so detailed" that it occasionally confuses patients and is not used "unless it's very necessary." So although Dr. Lu testified that his primary diagnostic tool was a "clinical questionnaire that took five minutes to complete," he also explained why he chose that test over competing diagnostic tests. Dr. Lu further testified that the questionnaire provided him with information necessary to diagnose King and that he diagnosed King with reference to the most current version of the

---

[1] Dr. Lu explained that MMPI referred to the Minnesota Multiphasic Personality Inventory, a personality test that consists of approximately 200 questions. A computer scores the test, and the test identifies behavioral ranges such as narcissistic personality, anti-social personality, avoidance personality, depressive personality, paranoid personality, or schizoid personality. Dr. Lu also explained that the MCMI III test consists of 175 yes-or-no questions. A computer also scores the MCMI III test, which analyzes psychiatric, psychological, and personality trends. *See generally People v. Stoll*, 49 Cal. 3d 1136, 265 Cal. Rptr. 111, 783 P.2d 698, 704-05 (1989) (en banc) (discussing the MMPI and MCMI tests).

Diagnostic and Statistical Manual at the time of his analysis.[2] But in eliciting testimony from Dr. Lu, the People did not demonstrate the inadequacy or inaccuracy of the information that he relied upon when diagnosing King. *See People v. Lacalamita*, 286 Mich. App. 467, 780 N.W.2d 311, 313 (2009) ("Where expert testimony is presented in support of an insanity defense, the probative value of the expert's opinion depends on the facts on which it is based." (citing *People v. Dobben*, 440 Mich. 679, 488 N.W.2d 726, 734 (1992))). Nor did the People demonstrate that Dr. Lu misapplied the questionnaire during his diagnosis. *See Carter*, 252 F.2d at 617 ("The chief value of an expert's testimony . . . rests upon . . . the reasoning by which he progresses from his material to his conclusion[.]"). So, although the People established that Dr. Lu used one test instead of others to diagnose King, this fact alone does not invalidate Dr. Lu's diagnosis of King.

■ During cross-examination, the People also attempted to impeach Dr. Lu's diagnosis of King by asking him a hypothetical question. The People asked: "if [King] is upset and agitated and threatens to burn the place down because he is not being let in . . . that *could be a result* of him being upset in lieu of a form of mental disorder; correct?" (Emphasis added). Dr. Lu responded: "Correct." The People claims that Dr. Lu's answer "elicited the important fact that King acted out of frustration and anger and not his mental illness." But for hypotheticals concerning the sanity of a defendant to be probative of the defendant's sanity, the People must include some evidence of insanity in its hypothetical. *See, e.g., Cates v. State*, 171 Miss. 106, 157 So. 95, 100 (1934) (where evidence of insanity was omitted from hypothetical questions, there "could be no dispute" that experts would conclude that the defendant was sane); *see also Taylor v. McClintock*, 87 Ark. 243, 112 S.W. 405, 420 (1908) ("Hypothetical questions must fairly reflect the evidence, and unless they do the resultant opinion evidence is not responsive to the real facts, and can have no probative force. . . . The right [of a party to introduce expert

---

[2] As described by one court, the Diagnostic and Statistical Manual is "[a] standard mental health diagnostic manual published by the American Psychiatric Association." *People v. Serravo*, 823 P.2d 128, 131 n.6 (Colo. 1992) (en banc). Another court has described the Diagnostic and Statistical Manual as "a treatise created by the American Psychiatric Association in 1952, which, by classifying mental disorders, serves as the standard diagnostic handbook used by psychiatrists and psychologists throughout the United States." *State v. Harris*, 48 Misc. 3d 950, 12 N.Y.S.3d 762, 764 (2015) (internal quotation marks omitted).

912

testimony pertaining to sanity or insanity] may be abused by allowing the opinion to be given in such a way as to mislead the jury, by concealing the real significance of the evidence, or by unduly emphasizing certain favorable or unfavorable data." (citations omitted)); *but see Burt v. State*, 40 S.W. 1000, 1001 (Tex. Crim. App. 1897) (a hypothetical concerning the defendant's sanity need not recite every fact pertaining to insanity). Here, the People only asked Dr. Lu to assume that an individual was "upset and agitated and threaten[ed] to burn [a building] down because he [was] not being let in." The People did not ask Dr. Lu to assume that the individual held a strong and erroneous belief that he owned the building, or that the individual had made repeated attempts to enter the building in the past while operating under that same belief. Since the People's hypothetical required no assumption of facts that showed insanity, Dr. Lu's agreement that certain actions "could be a result" of agitation instead of a mental disorder has no probative value concerning whether King's actions were the product of agitation instead of mental illness.

██ The People also elicited testimony from Officer Turnbull and DeJongh to attempt to prove King's sanity. "However, before a non-expert witness may testify to the sanity of the defendant, the party offering the testimony must show a familiarity with the defendant to clearly indicate that the testimony will be of value in determining the defendant's sanity, and the conclusion must be based on the witness's testimony as to specific instances of behavior or conduct near the time of the offense." *Petric*, 61 V.I. at 411-12 (collecting cases). Officer Turnbull testified to no such familiarity with King, so her observations that King "was agitated" and "look[ed] a little irritated and upset" do not constitute evidence that King was sane. *See id.* at 412 (officers' testimony that defendant was alert and responsive several days after committing murder did not constitute evidence of sanity where the officers did not testify to prior familiarity with the defendant); *Williams v. State*, 291 Ala. 213, 279 So. 2d 478, 479 (1973) ("[T]he value of such testimony by a lay witness . . . depends simply upon the fact that he has an acquaintance with the party, whose sanity is questioned, of sufficient duration and intimacy to have afforded him opportunities for such frequent observation, as to justify the formation of a correct opinion as to the question of sanity or insanity." (quoting *Ford v. State*, 71 Ala. 385, 397 (1882)) (internal quotation marks omitted))).

913

■ ■ ■ By contrast, "a familiarity with [King that] clearly indicate[s] that [his] testimony will be of value in determining [King's] sanity" was established by DeJongh's testimony. *Petric*, 61 V.I. at 412. DeJongh testified that he had known King for several years, that, when he met King, King claimed he was starting a basketball league for neighborhood children, that DeJongh provided him with money to purchase basketballs for that league, and that, for years, DeJongh welcomed King at his business. *See Sanders v. State*, 450 S.W.2d 871, 872 (Tex. Crim. App. 1970) ("[I]f a witness testified to actual personal conversations with and observations of the party whose sanity is under investigation, he may be allowed to express his opinion." (citation and internal quotation marks omitted)). But DeJongh's "testimony as to specific instances of [King's] behavior or conduct near the time of the offense," *Petric*, 61 V.I. at 412, does not constitute evidence that King was sane because it indicates that on April 1, 2015, King appeared agitated, made noises, shouted, threatened to burn DeJongh's building down, and ultimately threw a concrete paver through a glass door, all based on the mistaken conviction that he owned DeJongh's building. Far from suggesting sanity, this testimony suggests that King's April 1, 2015 actions were premised on the delusion that he owned DeJongh's building. Thus, DeJongh's testimony was not supportive of a finding that King was sane at the time of the offense. *Cf. Mason v. United States*, 402 F.2d 732, 738 (8th Cir. 1968) (lay witness observations indicating that the defendant looked and behaved as a person that possessed the ability to control his actions and to distinguish right from wrong were probative of whether the defendant was sane); *People v. Williams*, 201 Ill. App. 3d 207, 558 N.E.2d 1258, 1266, 146 Ill. Dec. 924 (1990) (evidence that defendant planned a crime and employed methods to prevent detection constituted evidence of the defendant's sanity); *Commonwealth v. Keita*, 429 Mass. 843, 712 N.E.2d 65, 70 (1999) (testimony that defendant did not struggle during arrest, cooperated during booking, and cooperated in answering police questions constituted evidence that the defendant was sane), *overruled in part on other grounds by Commonwealth v. Lawson*, 475 Mass. 806, 62 N.E.3d 22, 31 n.8 (2016); *McGregor v. State*, 1994 OK CR 71, 885 P.2d 1366, 1376 (Okla. Crim. App. 1994) (testimony that lay witnesses "noticed nothing unusual," and that defendant seemed "normal" and "as he always had" on the days before and after the crime constituted evidence of sanity). And even if King's actions appeared rationally calculated to enter

DeJongh's building, DeJongh's testimony does not contradict Dr. Lu's conclusions that King suffers from paranoid delusions, or that King's actions were premised on those delusions. *See Galloway v. State*, 938 N.E.2d 699, 712 (Ind. 2010) (in the absence of conflicting expert opinions, "there must be other evidence . . . from which a conflicting inference of sanity can be drawn").

Taken together, the People's cross-examination of Dr. Lu, coupled with the testimony of Officer Turnbull and DeJongh, even when viewed in a light most favorable to the People, was insufficient to prove beyond a reasonable doubt that King was sane when he threw a concrete paver through DeJongh's door, and the Superior Court erred in denying King's motion for judgment notwithstanding the verdict. Accordingly, we reverse the Superior Court's judgment and commitment, and remand this matter in order for the Superior Court to enter a judgment of not guilty by reason of insanity on all counts. *See Petric*, 61 V.I. at 413-14 (describing the appropriate remedy when the People fails to prove sanity beyond a reasonable doubt).

## B. The Jury Instruction

■ In addition to his challenge to the sufficiency of the evidence, King also argues that the Superior Court failed to instruct the jury on the consequences of finding him not guilty by reason of insanity ("NGI"), creating "ambiguity and confusion" amongst members of the jury. Because we reverse the judgment due to the Superior Court's failure to grant King's motion for judgment notwithstanding verdict, we do not necessarily need to reach this issue. We nevertheless address it as part of this appeal in the interests of judicial economy because the issue is likely to arise in the Superior Court again. *See, e.g., Samuel v. United Corp.*, 64 V.I. 512, 521 (V.I. 2016). King did not object to the jury instructions at trial, so we review the Superior Court's instructions only for plain error. *Monelle v. People*, 63 V.I. 757, 763 (V.I. 2015). In doing so, we consider King's challenge in light of the jury instructions and trial record as a whole. *Freeman v. People*, 61 V.I. 537, 544 (V.I. 2014); *Burke v. People*, 60 V.I. 257, 264 (V.I. 2013); *Nanton v. People*, 52 V.I. 466, 479 (V.I. 2009).

■ The plain text of the Virgin Islands Code does not obligate the Superior Court to instruct a jury on the consequences of returning an NGI verdict. *See* 5 V.I.C. § 3637(a) (if a defendant has raised mental illness as

a defense, "the jury shall be instructed, if they find [the defendant] not guilty on that ground, to state that fact in their verdict"). However, the Due Process Clause — which applies to the Virgin Islands by virtue of section 3 of the Revised Organic Act, 48 U.S.C. § 1561 — may require that the Superior Court instruct the jury on the consequences of returning an NGI verdict "when, in light of the totality of the circumstances, there is a genuine danger that the jury will convict based on something other than the State's lawful evidence, proved beyond a reasonable doubt." *Delo v. Lashley*, 507 U.S. 272, 278, 113 S. Ct. 1222, 122 L. Ed. 2d 620 (1993) (citation and internal quotation marks omitted).

King claims that there was a genuine danger that the jury did not understand the consequences of returning an NGI verdict, and that the jury believed "that King w[ould] be released immediately to endanger himself or the community, or w[ould] be forever in a hospital at the taxpayer's expense." The United States Court of Appeals for the Third Circuit has explained that

> [t]he words "not guilty" contained in the insanity verdict invoke the idea that a potentially dangerous defendant will be unconditionally released after trial, while in fact he faces mandatory corrective proceedings. A juror who feels that a verdict importing freedom for defendant will endanger the community might, out of his sense of social responsibility, be swayed from rational deliberation and be unwilling to weigh properly the evidence of defendant's mental condition.

*Gov't of the V.I. v. Fredericks*, 578 F.2d 927, 935-36 (3d Cir. 1978) (collecting cases). Other jurisdictions share this concern. *See, e.g., Commonwealth v. Mutina*, 366 Mass. 810, 323 N.E.2d 294, 301-02 (1975) (explaining that the jury "applied their own standards of justice in arriving at a verdict" because they lacked knowledge of "the commitment necessarily flowing from a verdict of not guilty by reason of insanity"); *see also Lyles v. United States*, 254 F.2d 725, 728, 103 U.S. App. D.C. 22 (D.C. Cir. 1957) ("It is common knowledge that a verdict of not guilty means that the prisoner goes free and that a verdict of guilty means that he is subject to such punishment as the court may impose. But a verdict of not guilty by reason of insanity has no such commonly understood meaning."), *overruled in part on other grounds by United States v. Brawner*, 471 F.2d 969, 997, 153 U.S. App. D.C. 1 (D.C. Cir. 1972). These jurisdictions address this concern by entitling "a defendant who is relying on an insanity defense . . . [u]pon re-

quest, to an instruction on commitment procedures." *People v. Thomson*, 197 Colo. 232, 591 P.2d 1031, 1032 (1979) (collecting cases); *see People v. Cole*, 382 Mich. 695, 172 N.W.2d 354, 366 (1969). Even the Supreme Court of the United States has recognized that, under federal law, "an [NGI] instruction of some form may be necessary under certain limited circumstances." *Shannon v. United States*, 512 U.S. 573, 587, 114 S. Ct. 2419, 129 L. Ed. 2d 459 (1994); *see id.* (explaining that an instruction on the consequences of an NGI verdict may be appropriate where "a witness or prosecutor states in the presence of the jury that a particular defendant would 'go free' " if found not guilty by reason of insanity).

Not all courts share this concern. "[T]he rule that the jury ordinarily is not concerned with punishment generally is held applicable by the majority of courts in other states to the procedure followed with respect to a defendant acquitted for insanity." *State v. Huiett*, 271 S.C. 205, 246 S.E.2d 862, 864 (1978); *accord Mutina*, 323 N.E.2d at 301 n.9 (observing that "a majority of the States which have dealt with this issue have refused to allow such an instruction"). These courts reason that concerning the jury with the disposition of a criminal defendant after trial threatens to alter the traditional responsibilities of judge and jury during trial. *See United States v. McCracken*, 488 F.2d 406, 423 (5th Cir. 1974) (noting this concern); *United States v. Borum*, 464 F.2d 896, 901 (10th Cir. 1972) (same). These courts contend that "it is not for the jury to concern itself with procedures for dealing with someone who is adjudged to be not guilty because of mental disease, any more than it is for the jury to concern itself with parole practices in fixing penalties." *Madison v. State*, 287 Ark. 179, 697 S.W.2d 106, 107 (1985). Further, some courts have expressed concern that "no instruction could adequately postulate the impact of such a verdict on the appellant's future tenure" if institutionalized. *People v. Goad*, 421 Mich. 20, 364 N.W.2d 584, 590 (1984) (quoting *State v. Wallace*, 333 A.2d 72, 79 (Me. 1975)) (internal quotation marks omitted).

 But the concerns voiced by a majority of courts are not justified in this jurisdiction. "[C]ommitment in an institution on the grounds that one is mentally ill is not a criminal punishment because the purpose of the commitment is not punitive," *Farrell v. People*, 54 V.I. 600, 611 n.7 (V.I. 2011) (citing *Kansas v. Hendricks*, 521 U.S. 346, 363, 117 S. Ct. 2072, 138 L. Ed. 2d 501 (1997)), so an instruction on the consequences of an NGI verdict does not enmesh a jury's considerations of guilt with a

judge's considerations of punishment. And although some courts have found it difficult to fashion an instruction that "completely and accurately describes the disposition to be made of a person found not guilty by reason of insanity," *Goad*, 364 N.W.2d at 590, our mental illness statute describes the consequences of returning an NGI verdict, as it explains that, following such a verdict, "the court shall . . . commit the defendant to a forensic unit for custody, care and treatment from which he shall not be discharged until the court is satisfied that he has regained his capacity for judgment, discretion and control of the conduct of his affairs and social relations. . . ." 5 V.I.C. § 3637(a). In contrast, nothing in our statutes or case law addresses King's concern that a jury may choose to find a defendant guilty simply because it does not understand the consequences of returning an NGI verdict. Because our jurisdiction has not yet addressed this concern, the possible misapprehension of the consequences of an NGI verdict represents a genuine danger that a criminal defendant may be convicted on grounds other than the People's proof. When faced with "the possible miscarriage of justice by imprisoning a defendant who should be hospitalized," *Cole*, 172 N.W.2d at 366, the Superior Court should instruct the jury on the consequences of reaching an NGI verdict.[3]

■ Despite this conclusion, no such instruction was required here because King never requested one, and the record reveals no conduct that would obligate the Superior Court to issue such an instruction *sua sponte*. *See Kuk v. State*, 80 Nev. 291, 392 P.2d 630, 633-34 (1964) (court did not err by not issuing an instruction on the consequences of an NGI verdict where the entire transcript showed that the defendant was not prejudiced and he did not request one). Although King made at least four references to the fact that "the law does not impose any criminal liability or responsibility on a person who has mental issues," a more prejudicial statement is required before an instruction becomes necessary. *See, e.g., People v. Aliwoli*, 238 Ill. App. 3d 602, 606 N.E.2d 347, 353, 179 Ill. Dec. 515 (1992) (argument that the defendant was trying to "whip a game on you here, to try and trick you and confuse you . . . [and] flimflam you so

---

[3] In so reasoning, we clarify that the Superior Court should issue such an instruction when a defendant has raised the insanity defense and requested such an instruction. Otherwise, the Superior Court retains discretion to issue such an instruction in response to the conduct of the parties, as suggested by the Supreme Court in *Shannon v. United States*, 512 U.S. 573, 114 S. Ct. 2419, 129 L. Ed. 2d 459 (1994).

that he can go laughing out that door of this courtroom" did not necessitate an instruction on the consequences of an NGI verdict). Therefore, the Superior Court did not err when it did not instruct the jury on the consequences of finding King not guilty by reason of insanity.

## IV. CONCLUSION

The Superior Court erred in denying King's motion for a judgment notwithstanding the verdict because the People failed to prove, beyond a reasonable doubt, that King was sane when he committed the offenses with which he was charged. But the Superior Court did not err when it issued its jury instructions because, although the Superior Court should instruct the jury on the consequences of returning an NGI verdict when a defendant has raised the insanity defense and has requested such an instruction, King requested no such instruction here. Nevertheless, given the People's failure to prove King's sanity beyond a reasonable doubt, we reverse the Superior Court's November 18, 2015 judgment and commitment, and remand this matter with instructions to the Superior Court to enter a verdict of not guilty by reason of insanity on all counts.